# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Britton*, 2012 IL App (1st) 102322

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY BRITTON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-2322 |
| Filed<br>Rehearing denied | September 14, 2012<br>October 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a conviction for unlawful possession of heroin with intent to deliver, the appellate court rejected defendant's contention that there was a breakdown in the chain of custody of the seized drugs that amounted to reversible error, and the trial court did not abuse its discretion in denying his motion seeking disclosure of the surveillance location used by the police. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-21113; the Hon. John T. Doody, Jr., Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Philip D. Payne, all of State Appellate Defender's Office, of Chicago, for appellant. |

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Joan F. Frazier, and Lauren N. Bressack, Assistant State's Attorneys, of counsel), for the People. |

| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice McBride concurred in the judgment and opinion.
Justice Epstein specially concurred, with opinion. |

## OPINION

¶ 1    A jury found defendant guilty of possession of 1.2 grams of heroin with intent to deliver and he was sentenced to 7½ years in prison. On appeal, defendant contends that his conviction should be reversed because of a breakdown in the chain of custody of narcotics evidence used to sustain the conviction. Defendant also contends that the trial court erred when it denied his motion to compel disclosure of the surveillance location utilized to observe him engage in two narcotics transactions. Defendant finally contends that he was improperly assessed a $200 DNA indexing fee.

¶ 2    In a pretrial motion and subsequent renewal of that motion, defense counsel moved the court to compel disclosure of the surveillance location of Officer Lawrence Olivares, who conducted surveillance of defendant on October 15, 2009 beginning at approximately 2:30 p.m. Each of two trial court judges presiding at different times over defendant's case heard argument on the motion, conducted *in camera* hearings with Olivares, and subsequently denied the motion. After examining Olivares, Judge Mary Roberts concluded that since there was no issue of identification, the location would not be disclosed. Judge Thomas Doody concluded that the concern for officer and public safety outweighed defendant's interest in disclosure in this case, and also stated that defendant had the right to cross-examine Olivares on the weather conditions, lighting, distance, elevation, and obstructions.

¶ 3    At trial, Olivares testified that on October 15, 2009, at approximately 2:30 p.m., he set up a narcotics surveillance in the area of Roosevelt and Whipple, a known narcotics area from which he had made previous arrests, along with Officer Mata and Sergeant Blas. He was the surveillance officer while Mata and Blas were the enforcement officers. Olivares conducted the surveillance from a covert vehicle, from which he observed defendant standing in front of a liquor store located at 3034 West Roosevelt Road, at the intersection of Roosevelt and Whipple. Defendant walked back and forth in front of the liquor store, but he never left the corner of Roosevelt and Whipple.

¶ 4    Olivares testified about the weather and traffic conditions, explaining that Roosevelt is

a busy street with four lanes of traffic and that there was moderate vehicular and foot traffic. He testified that it was a clear day and nothing obstructed his view. Olivares was approximately 150 to 200 feet away from defendant, on ground level while in his vehicle. He used binoculars to observe defendant, and at different times during the surveillance, Olivares had both a frontal view and side view of defendant. Defendant was wearing a black skull cap, a black jacket with gray sleeves, and blue jeans. Olivares had never seen defendant prior to this date.

¶ 5 Approximately five minutes after Olivares began his surveillance, he observed an unknown African-American man approach defendant and give defendant an unknown amount of cash, and then the two men walked across Roosevelt to Douglas Park, where defendant reached up into a small tree and removed a plastic bag, removed an item from the bag, and gave it to the man. Defendant then placed the plastic bag back in the tree. There was a blue recycling bin next to the tree. When they crossed the street, the two men were approximately 50 feet closer to Olivares. After giving the item to the unknown man, defendant walked back across Roosevelt to the liquor store. Olivares could not see what was in the plastic bag.

¶ 6 Olivares continued his surveillance. Approximately 15 minutes later, another unknown African-American man approached defendant. The two men crossed Roosevelt, the unknown man gave defendant an unknown amount of cash, and defendant reached up into the same tree and grabbed the plastic bag, removed an item from it, and gave it to the unknown man. Defendant then put the plastic bag back into the tree and the man walked away. Defendant walked back to the liquor store. Olivares could not see what the item was that defendant gave to the man. Based upon his experience, Olivares believed defendant to have engaged in two narcotics transactions.

¶ 7 Olivares radioed to Blas and Mata and described defendant as "a male black with a black skull cap, black jacket and gray sleeves, blue jeans," and told them defendant was standing by the liquor store on Roosevelt and Whipple. Olivares remained in radio contact with Blas and Mata until they detained defendant, and Olivares confirmed they had the correct person. Olivares then directed Blas to the suspected narcotics. Blas crossed Roosevelt, went to the tree next to the blue recycling bin, reached up and removed the plastic bag. Blas notified Olivares that the bag contained suspected narcotics.

¶ 8 Although Olivares acknowledged that he momentarily lost sight of defendant when a big truck drove by, Olivares testified that he never lost sight of defendant or the tree. Aside from Blas and defendant, no one else went to the immediate area of the tree or touched the plastic bag or tree. Olivares could not testify to the specific location of the tree that defendant went to on October 15, 2009, because People's Exhibit 3, a photograph of the area where the tree was located, did not have the blue recycling bin in the photograph. Olivares did not take photographs or a video recording of the surveillance because he was engaged in a short-term, daily investigation, whereas video and photographs are normally taken for long-term conspiracy investigations.

¶ 9 Olivares wrote the arrest report and the case report, and in both reports he indicated that four Ziploc bags were recovered. He learned this number was incorrect when the crime lab

informed him that five Ziploc bags were inside the sandwich bag.

¶ 10       During cross-examination of Olivares, defense counsel elicited that Olivares was in the vicinity of Douglas Park, that cars were parked along Roosevelt, and that Olivares lost sight of defendant when trucks passed. Olivares could not see what items were exchanged between defendant and the two unknown African-American men who approached him. He did not indicate on his original case incident report that the bags had any color or prints, and he estimated the weight of the suspect heroin to be 0.4 grams, with an estimated street value of $60. On redirect, Olivares clarified that although there were trees in Douglas Park, the trees were not blocking his view of defendant or of the tree.

¶ 11       Sergeant Ronald Blas testified that he was in radio contact with Olivares and detained defendant based upon the description that Olivares provided. When Blas first saw defendant, defendant was crossing Whipple at the intersection of Whipple and Roosevelt. Blas and Mata detained defendant and received radio confirmation from Olivares that they detained the correct person. Then, Olivares directed Blas to the tree and Blas recovered a clear plastic sandwich bag which contained what he believed to be four green and white smaller Ziploc bags, each containing suspected heroin. He counted the Ziploc bags without taking them out of the sandwich bag. He later learned there were five bags, not four. After radioing to his partners that he recovered suspected narcotics, defendant was placed into custody. When they went back to the 10th District police station, Blas gave the sandwich bag holding the smaller Ziploc bags of suspected heroin to Mata. The narcotics were in Blas' constant care, custody, and control from the time he recovered them from the tree to the time he gave them to Mata. On cross-examination, Blas testified that he did not see any hand-to-hand transactions or buyers.

¶ 12       Officer Ricardo Mata confirmed Blas' and Olivares' testimony regarding detaining defendant. Additionally, Mata also testified that while at the station, he conducted a custodial search of defendant and recovered $21. Mata then received the narcotics from Blas, and Mata inventoried it under number 11818390. Mata counted the Ziplocs bags of narcotics through the larger plastic bag, and he believed there were four bags. He did not empty the sandwich bag to count the Ziploc bags. Mata identified People's Exhibit 4(a) as the Ziploc bags of suspected narcotics he inventoried in this case on October 15, 2009, and People's Exhibit 4(b) as the plastic sandwich bag that held the smaller Ziploc bags.

¶ 13       Mata inventoried the narcotics by placing them in a plastic bag, labeling it with the type of suspected narcotics–heroin, describing how the narcotics were packaged, assigning a unique inventory number, and heat-sealing the package. Mata testified that at the time of inventorying the narcotics and of providing grand jury testimony, he believed there were four Ziploc bags, but he later learned there were five. He testified that there was no difference in the narcotics he inventoried and the narcotics he testified to.

¶ 14       On cross-examination, Mata admitted that although he did not observe Blas retrieve the items from the tree in Douglas Park, the items nevertheless stayed in Blas' possession until they relocated to the station. He also testified that he did not indicate on his inventory report that the clear plastic bags had any green markings on them and that he did not indicate any markings on the report at all.

-4-

¶ 15    Linda Jenkins, forensic chemist for the Illinois State Police, testified that she recovered the narcotics from the Illinois State Police drug chemistry vault in a sealed condition. When Jenkins counted the bags, she emptied them out and noticed that there were five Ziploc bags and not four, as the inventory report indicated. She sent a discrepancy report to the Chicago police department but did not receive a response. Jenkins testified to a reasonable degree of scientific certainty that the substance tested positive for heroin and weighed 1.2 grams. On cross-examination, Jenkins testified that the items she tested had the same inventory number and that the inventory report did not indicate green and yellow markings on the Ziploc bags. However, the bags were clear, as the inventory report described.

¶ 16    Following Jenkins' testimony, the State moved to admit People's Exhibits 4(a) and 4(b), but defense counsel objected, arguing that the State failed to lay a proper foundation. The trial court admitted the evidence over defendant's objection. After the State rested, the defense moved for a directed finding, which the trial court summarily denied. The jury found defendant guilty of possession of heroin with intent to deliver. In defendant's motion for a new trial, defense counsel argued that the trial court erroneously admitted People's Exhibit Numbers 4(a) and 4(b) due to a lack of a proper chain of custody, but the trial court denied the motion, finding there was a proper chain. Defendant was sentenced to 7½ years of imprisonment. Among other fines and fees, the trial court imposed a $200 DNA indexing fee.

¶ 17    On appeal, defendant contends, first, that his conviction for possession with intent to deliver should be reversed due to a breakdown in the chain of custody for the narcotics. When reviewing the trial court's ruling on the sufficiency of a chain of custody, courts of review will reverse the trial court's ruling only upon a finding of abuse of discretion. *People v. Howard*, 387 Ill. App. 3d 997, 1004 (2009).

¶ 18    As an initial matter, in order to convict a defendant of unlawful possession of a controlled substance, the State must prove that the material recovered from the defendant is in fact a controlled substance. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). In narcotics cases, in which the physical evidence is not readily identifiable or may be susceptible to tampering, contamination, or exchange, the State must establish a chain of custody. *Id.* at 467. The State establishes a *prima facie* showing of a sufficient chain of custody for narcotics by establishing that reasonable protective measures were taken to ensure that the evidence has not been tampered with, substituted or altered between the time of seizure and forensic testing. *Id.* at 468. Once the State makes its *prima facie* showing, the burden shifts to the defendant to produce evidence of actual tampering, alteration or substitution. The burden then again shifts to the State to rebut the defendant's claim. *Id.* The defendant is not required to show evidence of actual tampering or substitution unless the State first establishes its *prima facie* showing that it is improbable that the evidence was compromised. *Id.* If there has been no evidence that the evidence was compromised, the State does not need to exclude every possibility of tampering or contamination. *People v. Lundy*, 334 Ill. App. 3d 819, 826 (2002) (quoting *People v. Bynum*, 257 Ill. App. 3d 502, 510 (1994)). It need only show that it took reasonable protective measures after the evidence was seized and that it is unlikely that the evidence has been altered. *Id.*

¶ 19    The State made a *prima facie* showing of a sufficient chain of custody. The disparity

between the number of Ziploc bags that Blas recovered from the tree and the number tested by Jenkins was a single bag. The testifying officers all admitted to being mistaken about the number of packets and admitted that they did not empty the contents of the plastic sandwich bag to count the individual Ziploc bags. There is no evidence in the record that Olivares weighed the bags on a scale. Rather, Olivares testified that Mata merely showed him the evidence. Further, both the arrest and incident reports he prepared indicate that Olivares *estimated* the weight to be 0.4 grams.

¶ 20    Further, the State presented sufficient evidence of handling and safekeeping between Mata and Jenkins. Mata inventoried the narcotics by placing them in a plastic bag, labeling it as heroin, the type of suspected narcotics, describing the packaging as clear bags, assigning it a unique inventory number, and heat-sealing the package. Jenkins received the evidence in a heat-sealed condition under the same inventory number. Although the inventory report did not indicate that the Ziploc bags had green and yellow markings, Jenkins testified that the bags were nevertheless clear, as the inventory report described. The fact that Olivares, Mata, and Blas mistakenly counted four Ziplocs without taking the bags out of the plastic sandwich bag to individually count them, and Jenkins did in fact empty the contents to find five bags, does not amount to such a breakdown in the chain of custody that it warrants a finding of abuse of discretion for the trial court's accepting People's Exhibits 4(a) and 4(b) into evidence.

¶ 21    Defendant relies on *People v. Terry*, 211 Ill. App. 3d 968 (1991), and *People v. Gibson*, 287 Ill. App. 3d 878 (1997), to support his argument that there was a complete breakdown in the chain of custody, thus warranting this court's reversal of defendant's conviction on the basis of the State's failure to prove the element of possession. However, both of defendant's cited cases are distinguishable. The disparities in *Terry* are significantly different from the present case because not only was there a 10-packet disparity in the number of packets recovered versus the number tested in *Terry*, but also the description of the actual substance was significantly different. *Terry*, 211 Ill. App. 3d at 972-73. In *Terry*, the officer recovered and inventoried white powder, while the forensic chemist tested a substance "saturated in a yellow uremic substance." *Id.* at 973. Finally, the inventorying officer estimated the weight to be 8 grams, while the actual weight established by the forensic chemist was 12 grams. *Id.*

¶ 22    In *Gibson*, this court held that the State failed to prove a sufficiently complete chain of custody where the inventorying officer weighed narcotics and found the narcotics to weigh approximately 2 grams, but the stipulated testimony of the forensic chemist found the narcotics to weigh 9.3 grams, an almost five-fold increase. *Gibson*, 287 Ill. App. 3d at 882. Additionally, unlike the evidence of handling and safekeeping between Blas, Mata, and Jenkins presented in the present case, there was also no evidence regarding handling and safekeeping between the inventorying officer and the chemist in *Gibson*, nor was there evidence of the procedures the inventorying officer employed to ensure the safekeeping of the narcotics. *Id.* Based upon the foregoing, we cannot conclude that the trial court abused its discretion in ruling the State presented sufficient evidence of a proper chain of custody for People's Exhibits 4(a) and 4(b), and in admitting those exhibits.

¶ 23    Defendant next contends that the trial court erred when it denied his motion to compel disclosure of Olivares' surveillance location. Defendant did not raise this issue in his posttrial

motion, thus it was waived. *People v. Enoch*, 122 Ill. 2d 176 (1988) (in order to preserve an error for appeal, the error must be objected to and included in the posttrial motion). Defendant invokes the plain error doctrine to bypass the principles of waiver. The plain error doctrine allows a reviewing court to consider an unpreserved error when a clear or obvious error occurred and (1) the evidence is closely balanced or (2) the error is so serious that it affects the fairness of defendant's trial and challenges the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); see also *Woods*, 214 Ill. 2d at 471-72. In reviewing a plain error contention, this court first determines whether error occurred at all. See *People v. Bannister*, 232 Ill. 2d 52, 65 (2008); *People v. Brant*, 394 Ill. App. 3d 663, 677 (2009).

¶ 24 In support of his contention of error, defendant cites *People v. Price*, 404 Ill. App. 3d 324 (2010), and *People v. Criss*, 294 Ill. App. 3d 276 (1998), to argue that the surveillance location privilege does not apply here because it only applies where its application protects private citizens who allow police to perform surveillance on their property and to encourage their continued cooperation. However, the case law does not support defendant's contention. In *Price*, 404 Ill. App. 3d at 332, this court concluded that to carry its initial burden of proof of showing that the privilege should apply in a given case, the State must present evidence that the location was *either*: (1) on private property with the permission of the owner, or (2) in a location that is useful and whose utility would be compromised by disclosure. In the pretrial context, once the State carries its burden of proof, the defense bears the burden of persuasion and can defeat the privilege by making a " 'strong showing that disclosure of the location is material or necessary to his defense and that his need for the information outweighs the public's interest in keeping the location secret.' " *Id.* (quoting *Criss*, 294 Ill. App. 3d at 281). The trial court must balance the public interests against defendant's need for disclosure to defend himself at trial. Factors to be considered in this balancing include but are not limited to "the crime charged, the possible defenses, the possible significance of the [witness's] testimony, and other relevant factors." (Internal quotation marks omitted.) *Id.* To make its determination, the trial court should order an *in camera* hearing during which the witness must reveal the surveillance location. *People v. Knight*, 323 Ill. App. 3d 1117, 1127 (2001).

¶ 25 The State met its initial burden of proof by presenting evidence during the hearing on defendant's motion that the officers continue to use the surveillance location and revealing the location would compromise future investigations and officer safety. Moreover, both trial court judges who presided over defendant's case conducted *in camera* hearings with Olivares and denied the motion to compel disclosure. Judge Doody, presiding judge over defendant's trial, concluded that concern for officer and public safety outweighed defendant's interest in disclosure and admonished the defense of its right to cross-examine Olivares on the weather conditions, lighting, distance, elevation, and obstructions. Judge Roberts also concluded that because identity was not at issue, the privilege would be applied.

¶ 26 Defendant further argues that withholding the location violated his rights to prepare a defense and to cross-examine. A criminal defendant has the fundamental right to confront the witnesses against him, including the right to cross-examine those witnesses. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; see also *Criss*, 294 Ill. App. 3d at 279; *Knight*,

323 Ill. App. 3d at 1121-22. "A trial court may not deprive a defendant of the right to question witnesses; however, it may limit the scope of cross-examination." *Criss*, 294 Ill. App. 3d at 279. The appellate court determines whether the lower court abused its discretion to the point of resulting in manifest prejudice in deciding to exclude certain testimony. *Id.* The State has a qualified privilege regarding the disclosure of secret surveillance locations. *Id.* at 281. The need for disclosure is decided on a case-by-case basis, balancing the public interest in keeping the location secret with the defendant's interest in preparing a defense. *Id.* The defendant must demonstrate the need for disclosure; mere speculation is not sufficient. *Id.* Further, disclosure of a surveillance location will be compelled at trial if the allegedly privileged information is material to the issue of guilt. *Knight*, 323 Ill. App. 3d at 1127. A defendant's right to cross-examine becomes more important in those instances where the witness is more critical to the government's case. *Id.*

¶ 27        In the present case, defendant did not make a strong enough showing that the exact location of the surveillance location was material or necessary to his defense, or that his need outweighed the public interest in keeping the location secret. *Criss*, 294 Ill. App. 3d at 281. Defendant does not claim mistaken identity or an alibi defense. When defendant stood in front of the liquor store, he was 150 to 200 feet away from Olivares, but when defendant crossed the street, he was 50 feet closer to Olivares. Olivares further testified that he was using binoculars to observe defendant and that he never lost sight of defendant, save when a large truck momentarily drove past defendant. When Blas and Mata detained defendant, Olivares confirmed he was the right person. Olivares also never lost sight of the tree where the narcotics were concealed. He did not leave his surveillance location until after defendant was placed in custody and the narcotics were recovered. See *contra Knight*, 323 Ill. App. 3d at 1120, 1128 (This court found prejudicial error when the trial court applied the nondisclosure privilege where the offender's identity was contested, the surveillance officer was not using binoculars, and both officers admitted to losing sight of the alleged offender for one to two minutes as they drove from the surveillance point.).

¶ 28        Defense counsel was allowed sufficient latitude to question Olivares' credibility, eliciting from Olivares that there was vehicular and pedestrian traffic and that Olivares was parked in the vicinity of Douglas Park. Defense counsel also questioned Olivares on whether the trees along the parkway to Douglas Park obstructed his view, and inquired about the route that defendant took when he paced in front of the liquor store. Olivares radioed a detailed physical description of defendant and his location. Blas and Mata confirmed Olivares' testimony when they testified about detaining defendant based upon the location and description provided by defendant. We cannot say, based upon the evidence adduced at trial, that the trial court abused its discretion in not compelling the disclosure of the surveillance location. Because the court did not err when it applied the surveillance location privilege, there could be no plain error.

¶ 29        Finally, defendant contends that the $200 DNA indexing fee he was ordered to pay should be vacated because his DNA was previously collected and placed into the Illinois database pursuant to a prior conviction. The Illinois Supreme Court held in *People v. Marshall*, 242 Ill. 2d 285, 303 (2011), that the DNA Indexing fee cannot be assessed against defendants whose DNA is already in the Illinois State DNA database due to a prior

conviction. See also *People v. Leach*, 2011 IL App (1st) 090339, ¶¶ 38-40. The State agrees that defendant was incorrectly assessed the fee and that the fee should be vacated. Accordingly, we vacate the $200 fee.

¶ 30    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County finding defendant guilty of possession of more than 1 but less than 15 grams of heroin with intent to deliver and vacate the imposition of the $200 DNA indexing fee. We affirm the judgment in all other aspects.

¶ 31    Affirmed in part and vacated in part.

¶ 32    JUSTICE EPSTEIN, specially concurring.

¶ 33    I concur with the judgment in this case because I do not believe defendant showed that the trial court erred in concluding that the surveillance location privilege applied, and therefore there could be no plain error. I also believe that the trial court here properly held *in camera* examinations to determine if the State could meet its initial burden of proof. The problem is that this court does not know what transpired during the examination. Therefore, I write separately because of concerns I have with the instant case and also to suggest a procedure that I believe should be followed by Illinois trial courts once the State invokes the privilege.

¶ 34    The majority states that "[t]he State met its initial burden of proof by presenting evidence during the hearing on defendant's motion that the officers continue to use the surveillance location and revealing the location would compromise future investigations and officer safety" (*supra* ¶ 25). But the record does not contain any of the "evidence" that was presented. Although the trial court here properly held an *in camera* examination (two times), to determine if the State could meet its initial burden of proof, there is no transcript and we do not know what transpired during the examination. I believe the procedure followed here precludes meaningful review. Also, although the majority correctly notes that, contrary to defendant's assertions, the surveillance location privilege is not restricted to only those instances where private citizens or private property is involved, the State nonetheless must present *evidence* to the trial court to show that the surveillance point was "in a location that is useful and whose utility would be compromised by disclosure." *People v. Price*, 404 Ill. App. 3d 324, 332 (2010). Here, the State argued in the trial court that "the location in this case is something that is used continually by police officers and disclosing that would severely threaten the officers' safety and future operations of narcotics surveillance of this area surrounding Douglas Park, which is where this offense was committed." Again, when defendant renewed his motion for disclosure of the surveillance location, the State argued that "in the interest of officer safety and the fact that this is a spot that the officers continue to use, a high narcotics area, and the safety of the individuals involved who allowed the officers to be around and to use this spot, that is an overarching concern here in this case here." Argument, however, is not evidence.

¶ 35    Defendant contends that the surveillance location privilege does not apply in this case where the officer observed the events "from a public road in a public park." However, I do

not believe that this court is able to conduct a meaningful review of defendant's claim because the record does not contain any of the evidence that was presented by the State during the *in camera* examination of Officer Olivares. There is no Illinois case precisely on point. Therefore, I believe that, when the State invokes the surveillance location privilege, Illinois trial courts should follow a procedure similar to that outlined by the New Jersey Supreme Court in *State v. Garcia*, 618 A.2d 326 (N.J. 1993). Similar to Illinois, New Jersey requires the State to "first convince a court that disclosure [of a surveillance location] would compromise an important public interest." *Garcia*, 618 A.2d at 332. New Jersey also requires the trial court to hold an evidentiary hearing "at which the State may attempt to justify application of the privilege." *Id.* However, as the *Garcia* court explained:

> "At that hearing the court should make a sealed record sufficiently detailed to facilitate appellate review. Defense counsel shall not attend the hearing." *Id.*

¶ 36    In spite of my concerns, I nonetheless agree with the majority's disposition of this issue because, although the record here does not contain a transcript of the *in camera* hearing, the burden was on appellant to present this court with an adequate record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984); see also *People v. Fair*, 193 Ill. 2d 256, 264 (2000) (applying *Foutch* in criminal appeal). In the absence of a sufficiently complete record, a reviewing court will presume that the trial court's ruling had a sufficient legal and factual basis and will resolve all doubts against the appellant. *Foutch*, 99 Ill. 2d at 392.

¶ 37    *Foutch* has been applied in the context of *in camera* proceedings. In *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 685 (2008), this court applied *Foutch* in concluding that we could not determine whether the trial court was correct because documents examined by the trial court *in camera* were not made part of the record, a burden borne by the appellant. Also, in *In re Marriage of Smith*, 132 Ill. App. 3d 694, 704 (1985), the appellant contended that the trial court erred in denying his request to allow his attorney to see opposing counsel's original time sheets where opposing counsel had used the original time sheets at trial to refresh his recollection. The *Smith* court noted that the trial court had inspected the original time sheets *in camera*, compared the hours on those sheets with the hours listed on the sheets attached to the fee petition, and had denied access based on work product privilege. *Id.* at 704. This court applied *Foutch* in rejecting appellant's argument. *Id.* As the *Smith* court stated, "because the record does not contain the original time sheets, we cannot say the trial court erred in holding that the time sheets were work product." *Id.*

¶ 38    Based upon the principles stated in *Foutch*, I must presume that the trial court correctly concluded that the State met its initial burden of demonstrating that the surveillance location privilege applied in the instant case. However, in order to allow meaningful review in future cases and determine if the State *actually* met its burden, I believe Illinois trial courts should follow the earlier outlined procedure that would allow this court to engage in an actual review of the evidence presented by the State during the *in camera* examination.