277 N.J. Super. 277 (1994)
649 A.2d 862
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSE RIBALTA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1994.
Decided November 3, 1994.
*282 Before Judges SHEBELL, WALLACE and KLEINER.
Claudia Van Wyk argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Ms. Van Wyk, Deputy Public Defender II, of counsel and on the brief).
Steven J. Kaflowitz, Assistant Prosecutor, argued the cause for respondent (Andrew K. Ruotolo, Jr., Union County Prosecutor, attorney; Sara B. Liebman, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Defendant, Jose Ribalta, was convicted by a jury of third degree distribution of a controlled dangerous substance (heroin), (N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3)), count one; and third degree distribution of that substance within 1,000 feet of school property, (N.J.S.A. 2C:35-7), count two. On May 21, 1993, defendant was sentenced to four years of imprisonment, with a three *283 year period of parole ineligibility on count two. Count one was merged into count two. Also imposed were a $35 forfeiture, $1000 Drug Enforcement Demand Reduction penalty, $50 laboratory fee, and a $50 Violent Crimes Compensation Board penalty.
In his brief on appeal, defendant raises the following legal arguments:
POINT I
THE MOTION JUDGE AND TRIAL JUDGE VIOLATED DEFENDANT'S RIGHT TO CONFRONT WITNESSES IN PRECLUDING DISCLOSURE OF THE DETECTIVE'S SURVEILLANCE POINT AND IN LIMITING UNDULY DEFENSE COUNSEL'S ABILITY TO EXPLORE VITAL FACTS ABOUT IT (U.S. CONST. AMEND. VI, XIV; N.J. CONST. OF 1947, ART. I, ¶ 10).
POINT II
THE STATE, THROUGH ITS CHIEF WITNESS, VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND HIS RIGHTS UNDER FORMER EVID.R. 55 BY ELICITING REPEATED TESTIMONY CONNECTING DEFENDANT TO A "REPUTED NARCOTICS TRAFFICKER" (U.S. CONST. AMEND. XIV; N.J.CONST. ART I, ¶ 1).
POINT III
THE PROSECUTOR'S CROSS-EXAMINATION OF DEFENDANT ABOUT IMPERMISSIBLE AND CONSTITUTIONALLY-PROTECTED TOPICS AND HIS REPEATED SUMMATION REMARKS RIDICULING THE DEFENSE DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL (U.S. CONST. AMEND. XIV; N.J.CONST. OF 1947, ART. I, ¶ 1).
On January 28, 1993, the court held an in-camera hearing, on the State's pretrial motion, based on State v. Garcia, 131 N.J. 67, 618 A.2d 326 (1993) and State v. Zenquis, 131 N.J. 84, 618 A.2d 335 (1993), to withhold the location of the surveillance site of the drug sale.[1] Although defendant argued that there was a substantial need for the information, the court ruled that a substantial need for the exact location had not been demonstrated. Defendant was to be permitted to question the detective on cross-examination, at trial, about the distance, angle, elevation, whether the detective's view was obstructed and whether he used binoculars, glasses or other devices.
*284 On February 10, 1993, an additional pre-trial conference was held on the limits of defendant's entitlement to cross-examination regarding the surveillance location. The judge decided to wait to hear the detective's testimony before making a ruling. The judge also held a hearing to determine whether the State could elicit testimony regarding the detective's observation of defendant giving a large sum of money to a known drug dealer, prior to the sale of heroin. The judge reserved this determination for trial as well.
On March 8, 9, 10, and 11, 1993, the trial took place. On March 9, 1993, the judge held an in-camera hearing and ruled that the only additional information about the surveillance location defendant would be entitled to was whether the observation was made from an occupied structure. The judge also ruled that the detective could testify to his observations pertaining to the defendant's flashing of money at passing vehicles, and that a similar wad of money was found on another individual by a different detective.
It was elicited at trial that on November 1, 1991, two detectives of the Elizabeth police department were conducting a surveillance between 11:00 a.m. and 1:00 p.m. at the intersection of Second and Pine Streets, from a concealed location. The surveillance was made from an occupied structure at a 60 degree elevated angle from the corner, at a distance of 75 feet. Binoculars were used at certain times to corroborate the detective's observations.
A map of the City of Elizabeth and a detective both indicated that Second and Pine Streets are within the thousand foot area of a school zone. The defense stipulated that the events observed were within a school zone, but it did not stipulate that the school buildings were used for school purposes.
At around 12 noon, the detective saw a male, standing on the southwest corner of Second and Pine Streets, remove a large sum of currency from his coat pocket and display it to persons standing around him and then put it back in his coat pocket. The detective testified that the money, folded in half, was about one-half to one inch thick.
*285 The detective described the male, later identified as Jose Ribalta, as a dark skinned male of Hispanic descent. The detective testified that at one point the suspect removed his baseball cap and his receding hairline was observed. The suspect had a thin to average build, full beard and mustache. He was wearing a long puffy quilted pea type tan coat, beige pants and brown boots. With the exclusion of the clothing, the defendant looked the same at trial as he did on November 1, 1991. No one else present at the scene fit that description.
After the initial display of money, the detective saw a car stopped at the intersection about to make a left hand turn. The defendant took a glassine envelope from his pocket and displayed it to the driver. The detective used binoculars to confirm that the object was in fact a glassine envelope, which the detective believed to be packaging for heroin. The detective testified that the driver of the car "completely blew Mr. Rivalta [sic] off indicating with his hand and a no shaking his head back and forth meaning [the detective] presume[d] he did not want to purchase any drugs." For approximately thirty minutes, the detective observed as defendant continued to attempt to wave vehicles down by showing heroin to the vehicles as they passed. None of the motorists, within that thirty minute period, bought from the defendant.
After thirty minutes, the detective saw a Mitsubishi van enter the intersection. The detective claimed that the operator was a reputed narcotics trafficker. The defense objected to this testimony, and after a lengthy argument, without the jury, the judge allowed the testimony. The detective testified that at approximately 12:45 p.m., Harry Benson came out of a vehicle and approached the defendant. The defendant gave Benson the wad of money he had displayed earlier. Benson then entered the Pioneer Homes complex. He left at approximately 12:52 p.m. and reentered the van. Over defendant's objection, the detective gave the following testimony on the "general practices of drug distributors:"

*286 In most cases drug dealers will not keep a large sum of drugs on them, especially in a hot area like Second and Pine Street. They will maintain a stash location where the quantity will be concealed. They'll only utilize one of a given product, whether it be cocaine or heroin, at a time because it's easily destroyed or discarded if the police come into the area.
Another detective testified that she received a radio transmission at about 12:45 p.m. which caused her to stop a vehicle two or three blocks from Second and Pine Streets. She testified that there were three males in the van, Harry Benson, Maruth Bamba, and Elijah Rhodes, whom she placed under arrest. She searched Benson and found a wad of money, approximately one inch thick, folded over and held by a rubber band, in his jacket pocket.
At about 12:47 p.m., during the surveillance of Ribalta, the detective saw a stocky, average-sized Hispanic man with a long dark pony tail, a mustache and the beginnings of a beard, walk up to the defendant. This man was later identified as Gilberto Santos. After a brief conversation, Santos gave the defendant two pieces of what the detective believed to be paper currency. The defendant removed a small white object from his coat pocket and handed it to Santos. The detective testified that based on his experience and training this was a narcotics transaction.
After the exchange, Santos began walking north on Second Street. The detective notified the surrounding police units of the transaction and gave a complete description of Santos. A detective arrested Santos a few minutes later, one block over from Pine Street. As the detective approached Santos, Santos threw away what appeared to be a glassine envelope of suspected heroin.
Defendant was then arrested, patted down for weapons, placed in handcuffs and put in the police car. A search of his person yielded $35 in U.S. currency. There were no narcotics found in the area or on the defendant. The laboratory's certificate of analysis reflected that the envelope seized from Santos contained.042 grams of heroin. Santos testified at trial that he had bought a bag of heroin from a black male "around the projects," but could not say whether the person was in court.
*287 Defendant testified that on November 1, 1991, he was living above a small store where he worked at Second and Pine Streets. On that morning, the defendant took the boss' son to school, and then stood in front of the store until the boss showed up at about 10:30 p.m. The defendant remained outside picking up papers while his boss sat on a bench. He then went with another person to get a beer. After they returned, the defendant said he was standing outside drinking his beer and talking to people, when a police officer put a revolver to his back, took him out to a police car, and searched his clothing and the area. The search included the corner and across the street "even in the grass, the weeds, the trash, everything." He said the police seized $5 from his pocket, and later found about $30 in his wallet. He denied that he gave a large sum of money to anyone, displayed heroin to anyone, or sold heroin to Santos.
The defense claims that the trial court abused its discretion in concealing the location of the surveillance site and in limiting cross-examination about the location.
Former Evid.R. 34, commonly known as the "official information privilege," states:
No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interest of the public.
[Evid.R. 34.]
In State v. Garcia, 131 N.J. 67, 618 A.2d 326 (1993) and State v. Zenquis, 131 N.J. 84, 618 A.2d 335 (1993), the Supreme Court held that "Evidence Rule 34 provides a `surveillance location privilege' that permits the State, in appropriate circumstances, to conceal information about the location from which law enforcement personnel observed alleged criminal activities." Garcia, supra, 131 N.J. at 73, 618 A.2d 326; Zenquis, supra, 131 N.J. at 86, 618 A.2d 335. The Supreme Court noted in Garcia that "in certain instances, a defendant's right to gain access to information not vital to the defense must yield to society's interests in effective law enforcement and in encouraging citizens to cooperate with the police." *288 Garcia, supra, 131 N.J. at 76, 618 A.2d 326. However, the surveillance-location privilege must yield when it infringes upon a defendant's constitutional rights. Id. at 79, 618 A.2d 326.
To establish the privilege, the state must first:
[D]emonstrate a realistic possibility that revealing the location would compromise present and future prosecutions or would possibly endanger lives or property. The trial court should hold an Evidence Rule 8 hearing at which the State may attempt to justify application of the privilege. At that hearing the court should make a sealed record sufficiently detailed to facilitate appellate review. Defense counsel shall not attend the hearing.
[Id. at 78, 618 A.2d 326 (emphasis added). See also Zenquis, supra, 131 N.J. at 88, 618 A.2d 335.]
"If the state meets this preliminary burden for application of the privilege, the court should permit disclosure if the information sought is relevant and helpful to the defense or essential to a fair determination of the case." Garcia, supra, 131 N.J. at 80, 618 A.2d 326. Thus, the defendant must make a "substantial showing of need" to defeat the State's proper assertion of the privilege. Id. at 81, 618 A.2d 326; Zenquis, supra, 131 N.J. at 88, 618 A.2d 335. This "procedure ensures a fair opportunity for the defense to make the case for disclosure and protects a defendant's right of confrontation." Garcia, supra, 131 N.J. at 81, 618 A.2d 326. The trial court must consider the "crime charged, the possible defenses, the possible significance of the privileged information, and other relevant factors." Id. at 80, 618 A.2d 326; (quoting Grodjesk v. Faghani, 104 N.J. 89, 99, 514 A.2d 1328 (1986)). See also Zenquis, supra, 131 N.J. at 88, 618 A.2d 335.
Trial courts must consider the possible disclosure of surveillance locations on a case-by-case basis. Garcia, supra, 131 N.J. at 80, 618 A.2d 326. Further, this court will not overturn a lower court's ruling unless after weighing the competing factors, this court determines that the trial court abused its discretion. Id. at 81, 618 A.2d 326; Zenquis, supra, 131 N.J. at 88, 618 A.2d 335.
We find ample evidence in the record to support the decision to conceal the surveillance location. The motion judge determined *289 that "disclosure of the particular site in question would compromise important public interests and, specifically, revealing the exact location would have the capacity to deprive present and future prosecutions and would probably endanger lives and property." The trial judge reaffirmed this finding after conducting another in-camera hearing before trial. These determinations were based on the evidence preserved in the sealed records, which this court has carefully reviewed. There was testimony that property and life would be in danger if the location were disclosed.
The public interest compelled the non-disclosure of the site. The location was a high-crime area and surveillance from the location generated hundreds of arrests. Non-disclosure was to protect the owner of the site from any reprisals because of his cooperation with the police. Further, there was a need for ongoing surveillance from this location because of continued drug trafficking in the area.
This case is distinguishable from Zenquis, supra, where the location privilege was found to be unwarranted. 131 N.J. at 89, 618 A.2d 335. In Zenquis the only testimony came from the surveillance officer. Id. Here, the surveillance detective gave detailed descriptions of the defendant's clothing and physical appearances, which were confirmed by the arresting officer. Further, the defense was allowed to cross-examine about all the vital information except on which side of the street the surveillance was conducted. Moreover, disclosing the location of the site would only have been of peripheral assistance to the defense. State v. Williams, 239 N.J. Super. 620, 634, 571 A.2d 1358 (App.Div. 1990). Although defendant argued that he did not have any drugs on him, very little money, and that there may be a mistaken identity, the trial court correctly found that these issues could be explored without knowing the exact location of the surveillance.
Based on the record before us, the trial judge properly concealed the surveillance location. Further, the limitation on cross-examination did not violate the defendant's right of confrontation. The defendant was allowed to inquire about distance, angle, *290 elevation, whether the view was obstructed and if any visual aids were used. The need for the exact location was not vital in these circumstances.
Defendant also asserts that he is entitled to a new trial because the State improperly connected him to a known drug trafficker in violation of his right to Due Process and Evid.R. 55.[2]
The detective testified that during his surveillance he saw a light gray and white Mitsubishi van travelling in the intersection, and that the operator was known to him as a reputed narcotics trafficker. Defense counsel immediately objected and asked for a mistrial based upon that comment. The judge excused the jury, and pointed out "that the jury at this point does not know that this van had anything to do with the defendant." He also said that "there had to be some limiting way in the course of the State's case to show that the money was disposed of without connecting it in any way to what was just starting to be said about the van."
The judge denied the defense's motion for a mistrial and ruled that the prejudice could be avoided by leading the officer's remaining testimony to avoid connecting the passing of the money to the van. The prosecutor explained the situation to the detective. The judge told the jury that the question and the beginning of the detective's answer had nothing to do with this defendant or this case.
The prosecutor questioned the detective on another matter before proceeding to ask him what happened to the wad of money. The detective said that he saw the defendant give the money to Benson and that after Benson went into the Pioneer Homes Housing project, he came out and reentered the van. Defense counsel again moved for a mistrial, which was denied. Another detective later testified that Benson was stopped and arrested behind Pioneer Homes while driving a van. The defense, at *291 sidebar, renewed its application for a mistrial, which the Judge denied.
The defense asserts that none of the references to Benson were relevant to any trial issue and were so pervasive as to affect the jury, regardless of any limiting instructions. We disagree.
In Panko v. Flintkote Co., 7 N.J. 55, 80 A.2d 302 (1951), the court stated:
It is well settled that the test for determining whether a new trial will be granted because of misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so.

[Id. at 61, 80 A.2d 302 (emphasis added).]
A motion for a mistrial should be granted only in those situations where to deny it would result in manifest injustice. State v. Lozada, 257 N.J. Super. 260, 277, 608 A.2d 407 (App.Div. 1992) (citing State v. DiRienzo, 53 N.J. 360, 251 A.2d 99 (1969)). A mistrial is an extraordinary remedy and should be resorted to only to prevent an obvious failure of justice. State v. Hubbard, 123 N.J. Super. 345, 351, 303 A.2d 87 (App.Div.), certif. denied, 63 N.J. 325, 307 A.2d 98 (1973) (citing State v. Provoid, 110 N.J. Super. 547, 558, 266 A.2d 307 (App.Div. 1970)).
Thus, the trial court must determine whether the error can be cured by a cautionary instruction or other curative steps. State v. Winter, 96 N.J. 640, 646, 477 A.2d 323 (1984). The Winter court stated:
A [motion for] mistrial is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting. A recognition of the discretion is the heart of State v. Witte, 13 N.J. 598, [100 A.2d 754] (1953), which upheld the denial of a mistrial motion based on the trial court's directive to the jury to disregard a prejudicial comment regarding organized-crime connections of various witnesses.... Unless the vice is plainly ineradicable by an instruction to the jury, a mistrial is not allowable of right.
[Id. at 647, 477 A.2d 323.]
*292 Defense counsel's concern was that the testimony about Benson being a known drug trafficker coupled with the testimony that the defendant was seen giving a large sum of money to Benson, would lead the jury to convict the defendant based on association. However, as the judge indicated, the jury was not told that the van of the known drug trafficker had anything to do with the defendant. The judge tried to prevent any problems by suggesting to the prosecutor a course of direct examination. Although, the State's witnesses inadvertently mentioned the van, the judge did not feel that this had the capacity to cause manifest injustice.
The trial judge was in the best position to evaluate whether manifest injustice would result from continuing the trial, and we defer to his decision. Winter, supra, 96 N.J. at 647, 477 A.2d 323. Moreover, the judge gave a limiting instruction requiring the jury to disregard the questions and answers relating to the van. The jury is deemed capable of following a curative instruction to ignore prejudicial matter. Williams v. James, 113 N.J. 619, 632, 552 A.2d 153 (1989). Also, "in administering the criminal law the courts must rely upon the jurors' ability and willingness to follow the limiting instruction without cavil or question." State v. Manley, 54 N.J. 259, 270, 255 A.2d 193 (1969).
Defendant further argues that the prosecutor violated Evid.R. 55, by linking the defendant to Benson. Evid.R. 55 provides:
[E]vidence that a person committed a crime or civil wrong on a specified occasion, is inadmissable to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
[Id.]
Under this rule of evidence, other criminal acts by a defendant are admissible so long as they are relevant to some matter in issue and are not received simply to show the general disposition of defendant to commit crime. State v. M.L., 253 N.J. Super. 13, 22, *293 600 A.2d 1211 (App.Div. 1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992).
The testimony complained of does not fall under Evid.R. 55, because giving money to another person is not a crime in itself, and thus may not constitute other crimes evidence subject to Evid.R. 55. See State v. Porambo, 226 N.J. Super. 416, 424-425, 544 A.2d 870 (App.Div. 1988). In any event, the State was offering relevant testimony about the money to validate the detective's observations.
The testimony that the defendant handed money to another party was important to the State's case. See State v. Cannon, 271 N.J. Super. 391, 638 A.2d 915 (App.Div. 1994). The fact that the defendant gave currency to Benson was an integral part of the drug transaction because drug dealers sometimes use third parties to either hold narcotics or the proceeds from the sales. Id. at 396, 638 A.2d 915. Therefore, the State did not violate defendant's rights under Evid.R. 55.
We reject defendant's assertions that the prosecutor's improper questioning on cross-examination and improper remarks made on summation deprived the defendant of his right to a fair trial. In State v. Acker, 265 N.J. Super. 351, 627 A.2d 170 (App. Div. 1993), we stated that:
[T]he primary duty of a prosecutor is not to obtain a conviction but to see that justice is done.... Thus, it is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
[Id. at 355, 627 A.2d 170 (citing State v. Marshall, 123 N.J. 1, 152-53, 586 A.2d 85 (1991)).]
A prosecutor's remarks and actions must at all times be consistent with his or her duty to ensure that justice is achieved. State v. Long, 119 N.J. 439, 483, 575 A.2d 435 (1990). "However, not every deviation from perfection on the part of a prosecutor warrants a reversal of a conviction." State v. Darrian, 255 N.J. Super. 435, 453, 605 A.2d 716 (App.Div. 1992). The prosecutor's duty does not preclude the making of a "vigorous and forceful presentation of the State's case." State v. Ramseur, 106 *294 N.J. 123, 320, 524 A.2d 188 (1987) (quoting State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739, cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958)).
Therefore, prosecutorial misconduct will not be grounds for reversal of a criminal conviction unless the conduct is so egregious that it deprived the defendant of a fair trial. State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987). To determine whether a particular comment is prejudicial, the court must appraise whether defendant's counsel made a timely objection, whether the comment was withdrawn quickly, and whether the court ordered the comment stricken from the record and instructed the jury to disregard it. Id. at 322-323, 524 A.2d 188. "If there is no objection made, the remarks will usually not be deemed prejudicial." Id. The comments complained of in the present case were not so egregious that reversal is warranted.
The defendant argues that the following portion of cross-examination requires a reversal:
Q. Mr. Ribalta, do you have an interest in the outcome of this case?
A. Yes, I am interested in that it comes out all right.
Q. By coming out all right you mean to be found not guilty. Is that correct?
A. Of course I think that they're not going to find me guilty.
Q. Would you agree that it's in your interest to testify in such a way as for you to be found not guilty?
THE COURT: Sustained.
When a defendant takes the witness stand in a criminal case, it is generally considered proper to call attention to his interest in the result. State v. Sinclair, 57 N.J. 56, 65, 269 A.2d 161 (1970). Nevertheless, the court sustained the objection and the prosecutor moved on to a new line of questioning. The judge instructed the jury to disregard the questions concerning whether the defendant had an interest in the outcome of the case. Therefore, any potential prejudice was cured.
Defendant cites State v. Ernst, 32 N.J. 567, 576-77, 161 A.2d 511 (1960), cert. denied, 364 U.S. 943, 81 S.Ct. 464, 5 L.Ed.2d 374 (1961), to support his argument that this line of questioning was *295 improper. However, in Ernst the prosecutor's remark was "when the defendant takes the stand he might say anything to save himself," and the defendant had not yet taken the stand. Id. at 577, 161 A.2d 511. The Ernst court ruled that the prosecutor could not attack defendant's credibility in advance of his testimony, but did not find reversible error. Id.
The defendant also complained that the following line of questioning was improper:
Q. All right. You said the owner wanted two people to stay in front of the bodega. Is that right?
A. Yes.
Q. What's the owner's name?
A. Rafael Ruis.
* * * * * * * *
Q. I'm sorry. Mr. Ruis isn't here today is he?
A. No. He must be at home or at work in his store.
* * * * * * * *
Q. Who was the other guy who worked with you in the bodega?
A. Tito.
Q. What's Tito's last name?
A. I don't know his last name.
Q. Tito is not here today is he?
In State v. McBride, 211 N.J. Super. 699, 701, 512 A.2d 583 (App.Div. 1986), we stated:
A prosecuting attorney may ask a jury to draw an adverse inference from a defendant's failure to call a witness only if the trial judge first has found, out of the presence of the jury, that the witness is within the defendant's power to produce and that the witness's testimony would be superior to that already utilized in respect to the fact to be proved.
[Id. See also State v. Clawans, 38 N.J. 162, 171-72, 183 A.2d 77 (1962) (the party requesting the charge must first advise the court of that intention, outside the presence of the jury).]
In this case, the prosecutor did not argue that the jury should draw an adverse inference. Rather, the question and answer were stricken from the record and the judge instructed the jury to disregard whether Tito or any other witness was present. As stated in State v. Farrell, 61 N.J. 99, 107, 293 A.2d 176 (1972), *296 "[g]enerally, a defendant will be barred from raising a claim of prejudice on appeal if the trial court orders that the remarks be stricken from the record and directs the jury to disregard them." Id. None of the remaining questions objected to by the defense during cross-examination of the defendant have sufficient merit to warrant comment. R. 2:11-3(e)(2).
The defense next argues that the prosecutor made improper remarks in his summation, and repeatedly impugned the honesty of defense counsel and the defendant. Prosecuting attorneys are afforded considerable leeway, within limits, in making their summations. Darrian, supra, 255 N.J. Super. at 458, 605 A.2d 716. Here, as in the cross-examination context, "the determination of whether prosecutorial misconduct denied defendant the right to a fair trial must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties...." Id. Further, not every suspected deviation from perfection on the part of the prosecution will justify reversal of a conviction. Bucanis, supra, 26 N.J. at 56, 138 A.2d 739. "Before such a result ensues, his infraction must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." Id. The prosecution is not precluded from making a vigorous and forceful presentation of the State's case. State v. Dixon, 125 N.J. 223, 259, 593 A.2d 266 (1991).
Here, it does not appear that the comments complained of in the prosecutor's summation deprived the defendant of a fair trial. The prosecutor also did not personally attack defense counsel, or argue that his entire defense was outrageous. Cf. State v. Acker, 265 N.J. Super. 351, 356, 627 A.2d 170 (App.Div. 1993). Considering the summation as a whole, we find no reversible error. See State v. Carter, 91 N.J. 86, 107, 449 A.2d 1280 (1982).
Affirmed.
NOTES
[1] The official information privilege of Evid.R. 34, now N.J.R.E. 515, covers this process.
[2] Now N.J.R.E. 404(b).