**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0737-16T1
                 A-0861-16T2

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

MAURICE L. SKILLMAN,

       Defendant-Appellant.

_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

HYKEEM E. TUCKER,

       Defendant-Appellant.

_____

           Submitted (A-0737-16) and Argued (A-0861-16)
           January 29, 2019 – Decided March 7, 2019

           Before Judges Yannotti, Rothstadt and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 13-09-1150.

Joseph E. Krakora, Public Defender, attorney for appellant in A-0737-16 (Michael J. Confusione, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent in A-0737-16 (Evgeniya Sitnikova, Deputy Attorney General, of counsel and on the brief).

John W. Douard, Assistant Deputy Public Defender, argued the cause for appellant in A-0861-16 (Joseph E. Krakora, Public Defender, attorney; Joshua D. Sanders, Assistant Deputy Public Defender, of counsel and on the brief).

Evgeniya Sitnikova, Deputy Attorney General, argued the cause for respondent in A-0861-16 (Gurbir S. Grewal, Attorney General, attorney; Evgeniya Sitnikova, of counsel and on the brief).

PER CURIAM

Defendants Maurice Skillman and Hykeem Tucker were tried before a jury and found guilty of purposeful or knowing murder and other offenses. Skillman and Tucker appeal from judgments of conviction (JOC) dated August 25, 2016. We address both appeals in this opinion. For the reasons that follow, we affirm defendants' convictions, but remand for resentencing because it is not clear from the record whether the judge intended to sentence defendants to terms of life imprisonment or seventy-five-year prison terms.

2

In September 2013, a Mercer County grand jury returned an indictment charging defendants with: the purposeful or knowing murder of Carl Batie, N.J.S.A. 2C:11-3(a)(1) or (2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), N.J.S.A. 2C:2-6 (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), N.J.S.A. 2C:2-6 (count three); and three counts of fourth-degree aggravated assault with a firearm, N.J.S.A. 2C:12-1(b)(4), N.J.S.A. 2C:2-6 (counts four, five, and six).

Defendants filed various pre-trial motions, including a motion to suppress surveillance videos, and a motion to bar a detective from narrating the videos as they were played for the jury. On June 25, 2015, the judge entered an order denying the motions. The motion judge found that the surveillance videos were sufficiently clear and could be admitted into evidence. The judge also found that the detective's narration of the videos was permissible as lay opinion under N.J.R.E. 701 because it was "rationally based upon [the detective's] own perceptions."

It appears that at some point, count six was dismissed. Thereafter, on various dates in January and February 2016, defendants were tried together

before a jury, with another judge presiding. After the State rested, the judge dismissed count four. The jury was unable to reach a verdict on the other counts, and the judge declared a mistrial. In May and June 2016, defendants were retried.

At the trial, the State presented evidence which established that on the evening of November 10, 2012, an event celebrating the re-election of President Obama was held at the Baldassari Regency (Regency), a club located at the corner of Morris Avenue and Division Street in Trenton. The Regency hired two officers employed by the Trenton Police Department (TPD), to assist in providing security for the event.

At around 12:30 a.m., a security guard denied an individual entry into the Regency because he was underage and provided someone else's identification. Thereafter, the officers on hand confiscated the identification and asked the individual to leave. The individual became agitated and told the officers, "Fuck you, I'll be back. I got something for you. I don't give a fuck if you're on-duty or off-duty, that badge don't mean shit. That badge ain't gonna save you from a bullet." This individual was later identified as S.R.[1]

---

[1] In this opinion, we refer to certain individuals by their first names to avoid confusion. We also refer to other individuals using initials to protect their privacy.

Marquis Skillman, defendant Skillman's brother, testified that on the evening of November 10, 2012, he drove his girlfriend's blue Chevrolet Impala to the Regency. Marquis went to the Regency with his brother and two other persons. One was known as Tex, and the other as Dower. Marquis identified Tucker in court as the person known as Tex. According to Marquis, that night, neither Tucker nor his brother were in possession of a gun.

At around 11:30 p.m. or midnight, Karshawn Batie and his brother Carl went to the Regency to attend the celebration. At some point, they went up to the Regency's exterior balcony, which is on the second floor. Carl began talking to security guard Alexis Feliciano, with whom he was acquainted. While Carl was talking to Feliciano, gunshots were fired at the balcony from the Regency's parking lot.

Feliciano stated that fifteen to twenty rounds were fired back-to-back. Feliciano told everyone to get down. He observed Carl gasping for air and saw that he had been shot in the head. Feliciano testified that he observed a person wearing a gray hoodie shooting at the balcony. He saw the suspect run into an alleyway.

Karshawn testified that when the shooting began, a woman grabbed him and pulled him to the ground. After the shooting stopped, Karshawn looked for

his brother. He saw Carl lying face up. Carl had been shot in the head. Carl was taken to a hospital, where he was pronounced dead. An autopsy was performed and it was determined that the cause of death was a gunshot wound to the head.

Detective Timothy Long of the TPD testified that he arrived at the Regency shortly after the shooting, and he observed about 200 people out in the street. Long described the atmosphere as panicked, with some people engaged in street fights and arguments. Long observed a black man wearing a black-hooded sweatshirt and gray pants, who was starting an argument with another black man.

Long saw the man with the hooded sweatshirt throw several punches at the other man. Long ordered the man to stop fighting, but he ignored him. The man started to walk off and tried to hop a fence at a residence on Division Street. Long eventually arrested the man, who was later identified as defendant Skillman.

Detective Scott Peterson of the TPD investigated the incident. He testified that on the night of the shooting, the Regency had at least five surveillance cameras. One camera was inside by the entrance, and other cameras were outside. The detectives downloaded videos from these surveillance cameras.

The jury was shown excerpts of the videotapes, along with screen shots taken from the videotapes. Peterson identified the videotapes and the screen shots. He described the locations of surveillance cameras that recorded the videos. He also identified the areas depicted on the videos and screen shots.

Peterson explained that a school is located across from the Regency on Morris Avenue, and on the evening of November 10, 2012, cars parked in the school's lot for the event. The Regency also has a parking lot where cars parked for the event. Peterson pointed out that there are several alleys near the Regency's parking lot, including Winton Alley and Saco Alley.

Peterson began his review of the surveillance footage with the video of the shooting, which he said occurred around 1:15 a.m. Peterson noted that the timestamp on the videos was fifty minutes ahead of the time recorded. He stated that the police recovered twenty-two shell casings from the center of the Regency's parking lot.

The footage recorded by one of the cameras depicted a portion of the Regency's parking lot near Saco Alley. It showed two individuals walking between two cars. Peterson testified that one of the individuals was a black male wearing a varsity-style jacket, and the other individual was a taller, thin male.

A-0737-16T1

He noted that at one point, the men are seen entering and exiting a white van in the parking lot.

Peterson testified that the video showed that at around 1:13 a.m., the two men were standing near the van. According to Peterson, it appeared that the tall man had something in his hand. Peterson said the video showed the men entering the alley. At around 1:14 a.m., the taller man walked towards the middle of the parking lot, and the man in the varsity jacket followed.

Peterson stated that the video showed the tall man walk back to the van and then proceed towards Saco Alley. The tall man then ran back from the alley, heading in the direction of Morris Avenue. Peterson testified that the video showed what appeared to be a flash of light, extending out from the tall man's arm. At that point, the man in the varsity jacket was in the middle of the parking lot.

Peterson testified that the investigation focused on identifying the two suspects. He reviewed the surveillance video of S.R.'s altercation with the police at the entrance to the Regency, but S.R. did not match the persons shown in the video recorded at the time of the shooting. Therefore, the police determined that S.R. was not a suspect. Peterson reviewed other surveillance videos, and in the videos, the varsity jacket stood out.

8

Another video was played for the jury, and Peterson testified it showed that around 11:54 p.m., a dark blue or black Chevrolet Impala enter the Regency parking lot and park near a work van. The investigators determined that the Impala was owned by Marquis's girlfriend, A.B. Peterson also noted that in the video, the man in the varsity jacket is seen getting out of the Impala.

Peterson interviewed Marquis and showed him a screen shot taken from footage recorded by the Regency's front-door surveillance camera at around 12:15 a.m. The screen shot showed Marquis and the person known as Tex. Marquis identified Tucker as the person called Tex. Peterson noted that during the investigation, he interacted several times with both defendants and he was familiar with them.

Peterson further testified that based on his investigation and his own observations of both defendants, Tucker is the person shown in the surveillance video wearing the varsity jacket, and Skillman is the taller man. Peterson also said other surveillance videos showed that around midnight, Skillman and Tucker walked towards the front entrance of the Regency, and several minutes after midnight, they entered with Marquis. Peterson said a surveillance video shows defendants leaving the Regency about forty minutes later.

9

Peterson also testified that another video recorded around 1:15 a.m., shows Skillman jogging through the parking lot at a fast pace. He stated that the video shows Skillman's arm down at his side, and there is a black object at the end of his arm. The video shows Skillman lift his arm and a flash of light comes from it. Defendants are then seen fleeing in the direction of the alleyways.

The jury found defendants guilty of the purposeful or knowing murder of Carl Batie, possession of a weapon for an unlawful purpose, unlawful possession of a handgun, and aggravated assault with a firearm upon Alexis Feliciano. The trial judge sentenced defendants on August 19, 2016.

The judge merged count two (possession of a weapon for an unlawful purpose) with count one (murder). The judge stated that he was sentencing both defendants on count one to life imprisonment, with an eighty-five percent period of parole ineligibility and five years of parole supervision, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. However, when he sentenced Skillman, the judge stated, "That means a [seventy-five]-year period of time, [eighty-five] percent of which must be served without parole." The JOCs for both defendants state that they were sentenced to seventy-five year prison terms, with a period of parole ineligibility as prescribed by NERA.

On count three (unlawful possession of a handgun), the judge sentenced defendants to concurrent terms of ten years in prison, each with a five-year period of parole ineligibility.  On count five (aggravated assault with a firearm upon Feliciano), the judge sentenced defendants to consecutive terms of eighteen months.  In addition, the judge imposed appropriate monetary fines and penalties, and ordered defendants to pay restitution of $7373.83.

Defendants appeal from the JOCs dated August 25, 2016.  In his appeal, Skillman raises the following arguments:

> [POINT I
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS THE SURVEILLANCE VIDEO FROM GOING BEFORE THE JURY AND PERMITTING DETECTIVE PETERSON TO "NARRATE" THE VIDEO FOR THE JURY.
>
> POINT II
> DEFENDANT'S RIGHT TO A FAIR JURY TRIAL WAS INFRINGED.
>
> POINT III
> THE PROSECUTION INFECTED THE FAIRNESS OF THE TRIAL BY TELLING THE JURY THAT DEFENDANT REFUSED TO SPEAK WITH THE POLICE ON ARREST.  (NOT RAISED BELOW).
>
> POINT IV
> THE PROSECUTION SKEWED THE REASONABLE DOUBT BURDEN.  (NOT RAISED BELOW).

11

POINT V
DEFENDANT'S SENTENCE IS IMPROPER AND
EXCESSIVE.]

In his appeal, Tucker raises the following arguments:

POINT I
PETERSON'S TESTIMONY NARRATING THE
SURVEILLANCE WITH HIS OWN OPINIONS AS
TO WHAT OCCURRED ON THE VIDEO INVADED
THE PROVINCE OF THE JURY AND USURPED
THE JURY'S FACTFINDING ROLE IN VIOLATION
OF N.J.R.E. 701 AND [DEFENDANT]'S RIGHTS TO
DUE PROCESS AND A FAIR TRIAL.

POINT II
THE JURY CHARGE RELATIVE TO
[DEFENDANT]'S STATEMENT WAS
INSUFFICIENT TO ADVISE THE JURY OF THE
NEED TO CRITICALLY AND EFFECTIVELY
EVALUATE THAT STATEMENT IN LIGHT OF
THE REALITY THAT JURORS HAVE GREAT
DIFFICULTY DISTINGUISHING BETWEEN
FALSE CONFESSIONS AND TRUE CONFESSIONS.
U.S. CONST. AMEND VI; N. J. CONST. ART I, PAR.
10.  (NOT RAISED BELOW).

POINT III
THE PROSECUTION SKEWED THE STATE'S
BURDEN TO PROVE ITS CASE BEYOND A
REASONABLE DOUBT.  (NOT RAISED BELOW)

POINT IV
THE TRIAL WAS SO INFECTED WITH ERROR
THAT EVEN IF EACH INDIVIDUAL ERROR DOES
NOT REQUIRE REVERSAL, THE AGGREGATE OF
THE ERRORS DENIED [DEFENDANT] A FAIR
TRIAL.  (NOT RAISED BELOW).

12

POINT V
THE SENTENCING COURT ERRED IN DETERMINING THE WEIGHT AFFORDED TO AGGRAVATING FACTOR SIX, N.J.S.A. 2C:44-1a(6), GIVEN THAT AGGRVATING FACTOR SIX STATISTICALLY HAS A NEGATIVE, DISPROPORTIONATE IMPACT UPON MINORITIES.

POINT VI
[DEFENDANT]'S SENTENCE IS EXCESSIVE, UNDULY PUNITIVE, AND MUST BE REDUCED.

II.

On appeal, Skillman and Tucker both argue that the trial judge erred by allowing Peterson to testify as to what was depicted on the surveillance videos shown to the jury. Defendants argue Peterson's testimony was not admissible lay opinion testimony under Rule 701, and improperly usurped the jury's fact-finding role. See N.J.R.E. 701.

We note initially that a trial court's evidentiary rulings are reviewed under a "deferential standard" and will not be reversed unless shown to be a mistaken exercise of discretion. State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). An appellate court should not set aside a trial court's evidentiary ruling unless it "was so wide of the mark" as to result in "a manifest denial of justice." State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

13

Here, the motion judge found that Peterson's testimony regarding the videos was admissible under Rule 701. The Rule states that: "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." Ibid. To be admissible lay opinion under Rule 701, the witness' perception must rest on knowledge acquired "through use of [his or her] sense of touch, taste, sight, smell or hearing." State v. McLean, 205 N.J. 438, 457 (2011) (citing State v. LaBrutto, 114 N.J. 187, 199-200 (1989); Estate of Nicolas v. Ocean Plaza Condo Ass'n, 388 N.J. Super. 571, 582 (App. Div. 2006)).

The witness' testimony also must "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Id. at 458. However, lay opinion testimony is not admissible under Rule 701 if it pertains to "a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion[.]" Id. at 459 (alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

The Court's decision in State v. Lazo, 209 N.J. 9 (2012) is instructive. There, the Court held that the trial judge erred by allowing a police officer to testify that he believed defendant closely resembled a composite sketch of the suspect, and for this reason, included defendant's photo in an array. Id. at 12. The Court determined that the officer's testimony improperly bolstered the victim's account and usurped the jury's responsibility to weigh the victim's credibility. Id. at 13.

In Lazo, the Court observed that other jurisdictions have permitted law enforcement officers to offer a lay opinion identifying a defendant from a photograph. Id. at 22. The Court noted that the Ninth Circuit had held that in a bank robbery prosecution, a probation officer could testify that he believed defendant was the person depicted in a surveillance photo in light of the many prior contacts between the two individuals. Ibid. (citing United States v. Beck, 418 F.3d 1008, 1011, 1015 (9th Cir. 2005)).

The Lazo Court pointed out that in Beck, the Ninth Circuit stated that whether such evidence "is 'helpful' . . . depends on various factors[.]" Ibid. (quoting Beck, 418 F.3d at 1015). Those factors could include "whether the witness knew the defendant over time and in a variety of circumstances." Ibid. (quoting Beck, 418 F.3d at 1015).

The Court in <u>Lazo</u> noted, however, that in another case, the Ninth Circuit had determined that it was error for the trial court to allow a police officer to identify a defendant from a bank surveillance photo because in that case, the officer did not know the defendant and "had never . . . seen him in person." <u>Id.</u> at 23 (quoting <u>United States v. LaPierre</u>, 998 F.2d 1460, 1465 (9th Cir. 1993)). "[T]he officer's knowledge of the defendant's 'appearance was based entirely on his review of photographs of [defendant] and witnesses' descriptions of him.'" <u>Ibid.</u> (second alteration in original) (quoting <u>LaPierre</u>, 998 F.2d at 1465).

The <u>Lazo</u> Court stated that when evaluating whether a law enforcement officer should be permitted to present lay opinion on the issue of identification, the trial court should "consider, among other factors, whether there are additional witnesses available to identify the defendant at trial." <u>Ibid.</u> (citing <u>United States v. Butcher</u>, 557 F.2d 666, 670 (9th Cir. 1977); <u>State v. Carbone</u>, 180 N.J. Super. 95, 97-100 (Law Div. 1981)).

In <u>Butcher</u>, the Ninth Circuit noted that while lay opinion testimony by law enforcement officers should not be encouraged, it can be admissible where there is no other available adequate identification testimony. <u>Butcher</u>, 557 F.2d at 670. In <u>Carbone</u>, the trial court admitted lay testimony where there was a lack of available eyewitness identification testimony, defendant's appearance had

16

changed, and the witness was familiar with the defendant's appearance when the offense was committed. Carbone, 180 N.J. at 100.

In this case, the motion judge did not err by permitting Peterson to narrate the surveillance videos and testify that defendants were the persons depicted in the videos. The videos are of varying quality, and Peterson stated that he had to watch them several times in order to determine what was occurring. Furthermore, the State only presented excerpts of the videos, which were recorded at various times, by different surveillance cameras. Peterson informed the jury of the locations of the cameras, the locations depicted, and the times the videos were recorded.

Peterson noted that during his investigation, he had several interactions with defendants and he was familiar with them. Moreover, during the investigation Peterson interviewed Marquis, who identified Tucker as the man in the varsity jacket and his brother as the tall man seen with him.

Furthermore, Peterson's testimony did not usurp the jury's fact-finding role. The jury was not bound by Peterson's opinions. The jurors were specifically instructed that they had to decide whether defendants were the persons depicted in the videos. Peterson's testimony assisted the jury in understanding the evidence and determining the facts at issue.

We also conclude that even if the judge erred by allowing Peterson's testimony, the error was harmless. As noted, during the investigation, Marquis identified defendants from a screen shot made from the surveillance video. At trial, Marquis admitted that during the interview, he identified defendants as the persons depicted in the screen shot.

In addition, the trial judge instructed the jury that it was their duty to determine whether the surveillance videos were reliable and whether they showed defendants committing the crimes for which they were charged. We must presume the jury followed the judge's instructions. See State v. Burns, 192 N.J. 312, 335 (2007) (citing State v. Nelson, 155 N.J. 487, 526 (1998)).

Therefore, even if erroneous, the judge's decision to allow Peterson to narrate the videos and identify defendants as the person depicted therein, was not "clearly capable of producing an unjust result." R. 2:10-2.

III.

Next, Skillman and Tucker argue that during his summation, the assistant prosecutor made a statement that skewed the State's burden of proof. Defendants did not object to the comment. Therefore, we consider whether the comment constituted plain error under Rule 2:10-2.

18

It is well-established that "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented."  State v. Frost, 158 N.J. 76, 82 (1999) (citing State v. Harris, 141 N.J. 525, 559 (1995); State v. Williams, 113 N.J. 393, 447 (1988)).  "[P]rosecutorial misconduct can be a ground for reversal" if it is "so egregious that it deprived the defendant of a fair trial."  Id. at 83 (citing State v. Ramseur, 106 N.J. 123, 322 (1987); State v. Siciliano, 21 N.J. 249, 262 (1956)).

In determining whether a prosecutor's statement deprived the defendant of a fair trial, we "consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them."  Ibid. (citing State v. Marshall, 123 N.J. 1, 153 (1991); Ramseur, 106 N.J. at 322-23; State v. G.S., 278 N.J. Super. 151, 173 (App. Div. 1994), rev'd on other grounds, 145 N.J. 460 (1996); State v. Ribalta, 277 N.J. Super. 277, 294 (App. Div. 1994)).  "Prosecutors should not make inaccurate legal or factual assertions during a trial."  Id. at 85 (citing State v. Engel, 249 N.J. Super. 336, 381 (App. Div. 1991)).

On appeal, defendants argue that the assistant prosecutor improperly stated that the State did not have to prove every fact beyond a reasonable doubt.

19

However, in a criminal prosecution, the State is only required to prove "every fact necessary to constitute the crime for which he is charged" beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970).

Thus, the State only has to prove the facts that constitute the elements of an offense beyond a reasonable doubt. See State v. Martinez, 97 N.J. 567, 572 (1984) (quoting State v. Brown, 80 N.J. 587, 592 (1979)). Therefore, the assistant prosecutor's comment was a correct statement of the law, and the prosecutor did not improperly skew the State's burden of proof.

Moreover, even if the prosecutor's statement was erroneous because the prosecutor failed to distinguish between facts that are an element of an offense and other facts, the error was not "clearly capable of producing an unjust result." R. 2:10-2. In his final instructions to the jury, the judge addressed the State's burden of proof. The judge stated:

> A defendant on trial is presumed to be innocent and unless each and every essential element of an offense charged in a count of the indictment is proved against the defendant beyond a reasonable doubt, the defendant must be found not guilty of that particular count. The burden is on the State. It doesn't shift. There's no burden or obligation on a defendant to enter or give any offer of proof whatsoever during the trial.

We must presume the jurors followed the court's instructions. Burns, 192 N.J. at 335 (citing Nelson, 155 N.J. at 526).

20

## IV.

We next consider Skillman's other contentions. He argues: (1) the motion judge erred by denying his motion to suppress the surveillance videos; (2) the trial judge erred by denying the motion to dismiss the panel of prospective jurors; (3) the State improperly informed the jury that he failed to provide a statement after he was arrested; and (4) his sentence is excessive.

A. Admission of the Video Surveillance Tapes

Skillman argues the motion judge erred by denying his motion to suppress the surveillance videos because they are "so 'grainy' as to render [them] untrustworthy[.]" Skillman asserts that the images are too poor to identify anyone, particularly when the flash from the weapon occurs. He also asserts that the timestamp on the videos is inaccurate.

As we stated previously, a trial court's evidentiary ruling should not be reversed unless shown to be a mistaken exercise of discretion. Perry, 225 N.J. at 233 (citing Brown, 170 N.J. at 147). We will not reverse unless the ruling was "so wide of the mark" that it resulted in "a manifest denial of justice." Marrero, 148 N.J. at 484 (1997) (quoting Kelly, 97 N.J. at 216).

We are convinced that the motion judge's decision to deny the motion to suppress the surveillance videos is supported by the record. In his written

opinion, the judge noted that "while not perfectly clear," the videos are "sufficiently intelligible and contain[] probative value as to the identity of the shooter and possible accomplices."  The judge found that the recordings are "not so grainy as to render [them] untrustworthy."  Furthermore, although the record shows that the timestamp on the recordings was incorrect, Peterson testified that the timestamp was actually fifty minutes ahead of the actual time.  Accordingly, we conclude the judge did not abuse his discretion by allowing the State to introduce the videotapes.

B. Alleged Denial of Right to Fair Trial

Skillman asserts that during voir dire, the jury was informed that the Public Defender was representing him at trial.  He also contends that the jury was tainted because during jury selection, certain persons distributed pamphlets outside the courthouse that discussed a juror's "rights" and "jury nullification."  He contends because some prospective jurors received copies of the pamphlets, the judge should have declared a mistrial and discharged the panel.

"Our State and Federal Constitutions guarantee the right to trial by an impartial jury."  State v. Fortin, 178 N.J. 540, 575 (2004) (citing U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 10).  However, the trial judge has broad discretion in jury selection and "its exercise of [that] discretion will ordinarily

22

not be disturbed on appeal." State v. Papasavvas, 163 N.J. 565, 595 (quoting State v. Jackson, 43 N.J. 148, 160 (1964)).

Here, the record does not support Skillman's assertion that the jury was informed the Public Defender was representing him at trial. The record shows that the court clerk referred to an "intern" but the clerk did not mention the Public Defender. Assuming, however, that the clerk made the alleged statement, the judge did not abuse his discretion by denying Skillman's motion to discharge the panel.

The alleged reference to the Public Defendant was not capable of denying defendant a fair trial. See State v. Martini, 131 N.J. 176, 265-67 (1993) (finding that a witness's "inadvertent remark" about the Public Defender's office did not constitute reversible error), overruled on other grounds by Fortin, 178 N.J. at 646. We conclude that the judge did not err by denying the motion to discharge the panel.

Skillman also argues that the trial judge erred by denying his request to discharge the panel because some jurors were given copies of the aforementioned pamphlets. The record shows that on the second day of voir dire, the prosecutor questioned a juror about a bookmark she was using. The

juror stated that on the previous day, several individuals were outside the courthouse handing out pamphlets.

The pamphlets, which have not been included in the record on appeal, apparently discussed a juror's "rights" and "jury nullification." The judge indicated that he would question the prospective jurors about the pamphlets at sidebar.

Thereafter, Skillman moved to discharge the entire panel, arguing that jury pool had been tainted because the pamphlets contained incorrect information and instructed the jurors to be untruthful when questioned during jury selection. The judge denied the motion.

We are convinced the judge's ruling was not a mistaken exercise of discretion. The judge instructed the jurors that some of the information in the pamphlets was incorrect, and that they had to follow their oath to be fair and impartial. The judge apparently was satisfied that the jurors could be fair and impartial. The record supports that determination.

C. Alleged Improper Comment

Skillman asserts that the State impermissibly "told the jury that [he] refused to speak with the police on arrest." He argues that this alleged statement "infected the fairness of the jury trial and warrants a new trial."

24

A defendant's right against self-incrimination is protected under the Federal Constitution and New Jersey common law. U.S. Const. amend. V; State v. Elkwisni, 190 N.J. 169, 176, 180 (2007) (citing State v. Muhammad, 182 N.J. 551, 567 (2005)). Both the United States Supreme Court and our Supreme Court have "held that the use of a defendant's silence at the time of his arrest and after receiving Miranda warnings" is impermissible. Elkwisni, 190 N.J. at 177 (citing Doyle v. Ohio, 426 U.S. 610, 619 (1976)).

Here, the record shows that the assistant prosecutor questioned Peterson about Skillman's interview with the police:

> Q    Detective, we'll revisit the surveillance video from inside the police station. The early morning hours of November 11th of 2012, did there come a time when you tried to speak with, is it Maurice Skillman?
>
> A    Yes.
>
> Q    And was that interview video-recorded?
>
> A    Yes.

In responding to the prosecutor's question, Peterson did not state that Skillman had refused to speak to the police. However, on cross-examination, Skillman's attorney asked Peterson, "Now, you said that my client refused to talk to you?" Peterson responded, "Yes."

Thus, the statement was elicited by the defense, not the State. There is, however, no indication that Skillman was prejudiced by Peterson's brief remark. We conclude Peterson's comment was not "clearly capable of producing an unjust result." R. 2:10-2.

D. Sentence

Skillman argues that his sentence is improper and excessive. He contends the judge did not adequately explain the basis for his findings of the aggravating factors or the weight he assigned to them. He also contends the judge did not explain why the sentence imposed was warranted. He argues that the matter should be remanded for resentencing.

Here, the judge found aggravating factors three, six, and nine. N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge also found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment will cause excessive hardship to himself or his dependents). The judge noted that Skillman is not married, but has a child for whom he pays support. The judge gave the mitigating factor little weight.

The judge also noted that Skillman has a history of arrests and convictions. As a juvenile, Skillman had four arrests, with two adjudications. As an adult, Skillman had nine arrests, and two Superior Court convictions. In addition, he

had seven municipal court convictions. The judge observed that Skillman has "a pattern of constantly not following society's rules and regulations in accumulating this kind of a record."

In addition, the judge stated that aggravating factor three was "a very serious factor in this case." The judge reasoned that the risk of further offense was serious based on the nature of the offense. The judge stated, "It strikes me that a person who is capable of committing an act such as this of extreme violence is capable of other acts."

The judge also noted that there was a strong need to deter someone like Skillman. The judge stated that considering the offense that Skillman committed, the only way to deter him was incarceration. The judge also stated that he hoped the sentence would deter others from committing this type of crime.

We review a sentence under an abuse of discretion standard. State v. Jones, 232 N.J. 308, 318 (2018) (citing State v. Robinson, 217 N.J. 594, 603 (2014)). In doing so, we must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record;' [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'"

A-0737-16T1

State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). We will not set aside a sentence unless "there is a 'clear showing of abuse of discretion.'" Ibid. (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)).

We are convinced the judge followed the sentencing guidelines, and there was sufficient evidence in the record to support the judge's findings of the aggravating and mitigating factors. We are constrained, however, to remand the matter for resentencing because it is not clear whether the judge intended to sentence Skillman to life imprisonment or to a base term of seventy-five years.

As we noted previously, when he sentenced Skillman, the judge stated that he was sentencing him to a term of life imprisonment. The judge then stated that, "That means a [seventy-five]-year period of time, [eighty-five] percent of which time must be served without parole." Skillman's JOC states that he was sentenced to a seventy-five year term, and must serve eighty-five percent of that term before being eligible for parole.

We note that NERA provides in pertinent part that a person convicted of a murder under N.J.S.A. 2:11-3 must serve a minimum term of eighty-five percent of the sentence imposed, before becoming eligible for parole. N.J.S.A. 2C:43-7.2(a) and (d). NERA also provides that, "Solely for the purpose of

calculating the minimum term of parole ineligibility pursuant to subsection a. of this section, a sentence of life imprisonment shall be deemed to be [seventy-five] years." N.J.S.A. 2C:43-7.2(b).

Thus, a life sentence is not the equivalent of a seventy-five-year sentence. Under NERA, a life sentence is deemed to be a seventy-five-year sentence solely for purposes of calculating the period of parole ineligibility.

Thus, it is not clear from this record whether the judge intended to impose a life term, as he stated at sentencing, or a seventy-five-year term, as indicated in the JOC. Accordingly, we remand the matter for resentencing.

V.

We turn to Tucker's other arguments. He argues that: (1) the jury charge regarding the statement he provided to the police was insufficient; (2) the cumulative error doctrine requires reversal of his conviction, and (3) his sentence is excessive.

A. <u>Jury Instruction</u>

Tucker argues that the jury charge regarding his statement to the police was flawed because it failed to provide the jury with sufficient guidance regarding "the dangers of false confessions." He contends this error requires reversal of his conviction and a remand for a new trial.

Here, the trial judge instructed the jury in accordance with the model jury charge on statements by defendants. See Model Jury Charges (Criminal), "Statements of Defendant" (rev. June 14, 2010). The judge told the jury that it had the duty to determine if Tucker's statement to the police was "reliable." The judge stated:

> In considering whether or not the statement is credible, you should take into consideration the circumstances and facts as to how the statement was made, as well as all other evidence in this case relating to this issue.
>
> As you heard from the testimony of Detective Scott Peterson, the defendant, Hykeem Tucker, was advised of the charges against him and his Miranda rights before he provided any statement to the police. You further heard testimony that the defendant, Hykeem Tucker, understood his rights and agreed to waive his rights and speak to Detective Peterson.
>
> If you determine that the statement is not credible, then you must disregard the statement completely. If you find the statement in part or all is credible, you may give what weight you think appropriate to the portion or the entirety of the statement you find to be truthful and credible.

We note that Tucker did not object to the instruction during the trial court proceedings. For the first time on appeal, he argues that the model jury charge should be modified. He contends jurors should be instructed that, "Although nothing may appear more convincing than a defendant's statement, you must

critically analyze such evidence. Such statements may be false. Therefore, when analyzing such evidence, be advised that the fact of making a statement, alone, is not an indication of the reliability of the statement."

In support of his argument, Tucker relies upon certain articles, which set forth results of social-science research pertaining to "confessions" by defendants in criminal matters. Tucker did not, however, present those articles to the trial court. Therefore, the State did not have an opportunity to dispute the findings in the articles.

Moreover, in his statement to the police, Tucker did not admit that he committed the charged offenses. He acknowledged he was at the Regency on the night of the shooting, but he repeatedly denied he was the shooter. Tucker's statement was not a confession. Thus, the social-science research that Tucker relies upon does not apply in this case.

In any event, the judge's instruction was a correct statement of the law. It is well-established that after the trial court determines a defendant's statement is voluntary and admissible, the jury should consider "whether in view of all the same circumstances the defendant's confession is true. If [the jurors] find that [the confession] is not true, then they must treat it as inadmissible and disregard

31

it . . . ." <u>State v. Hampton</u>, 61 N.J. 250, 271-72 (1972). The instruction provided in this case is consistent with this principle.

B. <u>Cumulative Error</u>

Tucker argues that even if the errors he cites did not individually constitute reversible error, in the aggregate, they denied him of his constitutional right to a fair trial. We disagree.

Our Supreme Court has held that "even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." <u>State v. Jenewicz</u>, 193 N.J. 440, 473 (2008) (citing <u>State v. Koskovich</u>, 168 N.J. 448, 540 (2001)). The cumulative error principle does not apply in this case. As we have explained, there was no error in the trial of this matter or any series of errors that, when considered in combination, cast sufficient doubt on the jury's verdict to require a new trial.

C. <u>Sentence</u>

On appeal, Tucker argues that the judge erred when he weighed the aggravating factors. He contends that the judge erred by giving weight to aggravating factor six, because that factor allegedly has a statistically disparate impact on minorities. Tucker further argues that his sentence is excessive and

unduly punitive. He contends his offense can be "adequately punished" with a lesser sentence. He argues that he should be resentenced.

When sentencing Tucker, the judge found aggravating factor three. N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense). The judge noted that Tucker was with Skillman "right down the line in everything that occurred that night." The judge stated the risk that Tucker will commit further offenses "is extreme." The judge observed that "given the enormity of the devastating effects of the criminal behavior that he was engaged in, the further risks are beyond reasonable comprehension."

The judge also found aggravating factor six. N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted). The record shows that as a juvenile, Tucker had eight juvenile arrests and four adjudications. As an adult, Tucker had sixteen arrests, several municipal court convictions, and two prior Superior Court convictions for drug-related offenses.

In addition, the judge found aggravating factor nine. N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge stated that "[t]he only way to deter [Tucker was] to incarcerate him[.]" The

33

judge observed that he hoped the message would go forth and "some lives would be saved[.]"

The judge found no mitigating factors and stated that the "aggravating factors . . . substantially outweigh[ed] the non-existent mitigating factors." On the JOC, the judge wrote, "The aggravating factors are overwhelming in significance by any standard."

We reject Tucker's contention that the judge erred by giving weight to aggravating factor six. The judge's finding was based on defendant's prior criminal record, and there is no evidence in the record to support Tucker's contention that aggravating factor six has a disparate racial impact.

Tucker's claim of racial disparity is based on articles and research that the defense did not present to the trial court. The articles and research are not part of the record on appeal. Moreover, the State did not have the opportunity to dispute the findings and conclusions set forth therein.

We are constrained, however, to remand for resentencing. As we stated with regard to Skillman's sentence, it is unclear whether the judge intended to sentence Tucker to a life term, as he stated on the record, or a base term of seventy-five years as stated in the JOC.

Accordingly, defendant's convictions are affirmed, but the matters are remanded to the trial court for resentencing in conformance with this opinion.

In A-0737-16 and A-0861-16, affirmed in part, and remanded for resentencing in conformance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0737-16T1