618 A.2d 326

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. MATTEO GARCIA, A/K/A EMTERIO ROMAN,
DEFENDANT-APPELLANT.

Argued October 13, 1992—Decided January 21, 1993.

68

*Jay L. Wilensky,* Assistant Deputy Public Defender, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney).

*Virginia M. Lincoln,* Assistant Prosecutor argued the cause for respondent (*James F. Mulvihill,* Acting Essex County Prosecutor, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 130 *N.J.* 13, 611 *A.*2d 652 (1992), to decide whether New Jersey should recognize a "surveillance location privilege," under which the State can refuse to disclose the exact location from which law-enforcement officers observe criminal activity. We hold that *Evidence Rule* 34, the "official information privilege," permits the State to withhold that information in appropriate circumstances. Because the Appellate Division correctly determined that the circumstances in this case justified non-disclosure of the surveillance location, we affirm.

## I

On January 8, 1989, Newark police officers Joseph Farina and Dennis McCauley observed defendant, Matteo Garcia, and an accomplice apparently selling drugs in the area of Clark Street and Broadway within 1,000 feet of a school. The officers were conducting a surveillance at that location based on an informer's tip that two males were dealing "Dope–P–Dope" (a street name for heroin) near that corner. The officers observed an unknown male, believed to be a drug buyer, approach Garcia's accomplice and speak briefly with him. After a short conversation with the accomplice, Garcia crossed the street and retrieved something from an abandoned freezer in a vacant lot. When he returned, Garcia handed the "frozen goods" to either the "buyer" or the accomplice (Officer McCauley's trial and grand jury testimony differed on that point), and the "buyer" gave money to the accomplice.

The officers witnessed the transaction with the aid of binoculars from a distance of approximately sixty feet. After leaving their observation post in an unsuccessful attempt to locate the buyer, the officers returned to the vacant lot, where they saw defendant and his accomplice. Garcia fled, but Officer Farina apprehended and arrested him. The officers also arrested the accomplice. Officer McCauley searched the freezer and found nine glassine envelopes of heroin marked "white monster" in a cardboard box. A search of the accomplice yielded $23. The police found no drugs or money on Garcia.

Before trial, the State moved pursuant to *Rule* 3:13–3(d)(1) for a protective order prohibiting disclosure of the officers' location during the surveillance. The court held an *in camera* hearing with defense counsel present. At the hearing, McCauley testified that he had observed defendant from an elevated position in an occupied building on Broadway, fifty to seventy-five feet south of the intersection of Broadway and Clark, and fifty to sixty feet from the site of the alleged drug transaction.

McCauley told the court that the police still used the building as a surveillance site because of extensive drug activity in that area. He expressed concern that drug dealers might retaliate against the building owner or burn down the block if they learned of the surveillance site. McCauley also told the court that persons often hesitate to allow the use of their properties for surveillance activities because they fear reprisal.

The court issued the protective order, denying defendant access to the precise surveillance location.

A jury convicted defendant of conspiracy, *N.J.S.A.* 2C:5-2; third-degree possession of heroin with intent to distribute, *N.J.S.A.* 2C:35-5(b)(3); and third-degree possession of heroin with intent to distribute within 1,000 feet of school property, *N.J.S.A.* 2C:35-7. After merging the conspiracy and third-degree possession convictions with the school-property offense, the court sentenced defendant to a five-year term.

On appeal, defendant asserted that the suppression of the surveillance site had unconstitutionally limited his right of cross-examination. The Appellate Division affirmed in a partially-published opinion, holding that the trial court had properly balanced defendant's need for disclosure against the State's interest in public safety. *State v. Garcia*, 255 *N.J.Super.* 459, 605 *A.*2d 728 (1992). The court held that "[f]ailure to disclose the precise vantage point was not prejudicial to defendant but rather served to protect school children and potential victims of retaliation." *Id.* at 468, 605 *A.*2d 728.

Although the Appellate Division did not premise its conclusion on *Evidence Rule* 34, we are satisfied that it resolved the issue consistent with our holding today.

## II

*Evidence Rule* 34, commonly known as the "official information privilege," states:

No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of

this State, or (b) if the judge finds that disclosure of the information in the action would be harmful to the interests of the public.

Dean Wigmore has noted that some "official information privilege" undoubtedly exists, but adds that "the scope of that privilege has not yet been defined with certainty." 8 *Wigmore on Evidence* § 2378, at 792 (McNaughton rev.1961). Although few of our cases have construed *Evidence Rule* 34, we are satisfied that a surveillance location falls within the type of information that a court may conceal in the public interest.

Although the privilege has most often arisen in cases concerning requests for government documents, the *Rule* in no way limits its application to those circumstances. *See generally North Jersey Newspapers Co. v. Passaic County Bd. of Chosen Freeholders*, 127 *N.J.* 9, 601 *A.*2d 693 (1992) (noting that in certain circumstances, *Evidence Rule* 34 will protect toll-billing records of government official); *McClain v. College Hosp.*, 99 *N.J.* 346, 492 *A.*2d 991 (1985) (discussing *Evidence Rule* 34 as possible basis for withholding transcripts of investigative proceedings of State Board of Medical Examiners); *Dixon v. Rutgers*, 215 *N.J.Super.* 333, 521 *A.*2d 1315 (App.Div. 1987) (rejecting University's argument that *Evidence Rule* 34 protects peer-review materials used for tenure evaluations), *aff'd and modified*, 110 *N.J.* 432, 541 *A.*2d 1046 (1988); *State v. Singleton*, 137 *N.J.Super.* 436, 349 *A.*2d 139 (Law Div.), *aff'd*, 158 *N.J.Super.* 517, 386 *A.*2d 880 (App.Div.1975) (discussing *Evidence Rule* 34 as possible basis for withholding transcripts of parole-revocation hearing), *certif. denied*, 79 *N.J.* 470, 401 *A.*2d 227 (1978). Because we see no reason to graft a government-documents limitation onto the plain language of the *Rule*, we conclude that in certain circumstances the "official information privilege" permits the State to conceal the exact location of police surveillance.

Our decision today tracks the Appellate Division's resolution of a similar issue in *State v. Travis*, 133 *N.J.Super.* 326, 336 *A.*2d 489 (1975), in which the court upheld the State's right

under *Evidence Rule* 34 not to reveal the exact locations óf wiretap equipment. The Appellate Division said:

> The trial judge ruled this information was privileged under regulations of the Public Utilities Commission and to reveal the monitoring location would endanger future surveillances. Be that as it may, we are of the view that defendant did not make a satisfactory showing of why this information was needed to show a possible inaccurate hookup. *Evid.R.* 34. [*Id.* at 332, 336 *A.*2d 489.]

California has also recognized the privilege under the "official information privilege" in that state's rules of evidence. In *People v. Montgomery*, 205 *Cal.App.*3d 1011, 252 *Cal.Rptr.* 779, 783 (1988), the court held that Section 1040 of the California Rules of Evidence, the "official information privilege," establishes a "surveillance location privilege." That section defines "official information" as "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made."

██  That language resembles closely an earlier, unadopted draft of *Evidence Rule* 34 that defined "official information" as

> information not open to or theretofore officially disclosed to the public relating to internal affairs of the State or of the United States acquired by a public official of this State or of the United States in the course of duty, or transmitted from one such official to another in the course of his duty. [Richard J. Biunno, *New Jersey Rules of Evidence, Rule* 34, comment 1 (1992).]

The foregoing comment goes on to explain that *Rule* 34 is an amalgam of former drafts of *Rules* 33 and 34. *Ibid.* (citing Report of the Commission to Study the Improvement of the Law of Evidence (1956 ed.), comment on *Rule* 33 at 39). Because we conclude that an officer conducting a surveillance is a "public official" acting "in the course of [the officer's] duty," the surveillance location qualifies as "official information" that becomes privileged, in the absence of a defendant's demonstration of need, if the State can show that disclosure would be "harmful to the interests of the public."

Failure to protect the confidential locations from which police have witnessed criminal activity would harm several important public interests. First, non-disclosure avoids compromising on-

going surveillances. Police officers often experience difficulty in finding places from which to observe criminal conduct unobtrusively. Officer McCauley testified that because he was well known in the area, the effective performance of his duties would be seriously inhibited were he not to have a secret surveillance site. Failure to conceal exact locations may force the State to choose between dropping the charges against a defendant or losing future arrests. Also, disclosure of the information might cause criminal offenders simply to relocate their activities to a place not visible from that surveillance location.

Second, the privilege protects police officers and private citizens from reprisal. Officer McCauley hesitated to reveal the surveillance location in this case because he feared for his own safety and the safety of those who had cooperated with him. If those bent on crime were to learn of the location of surveillance activities, they might resort to violence or engage in vandalism to render that site useless.

Third, and related to the second reason, the privilege encourages citizens to cooperate with police. If citizens know that a defendant charged with an offense can learn the exact surveillance location, many will not permit use of their property.

Our decision today to protect surveillance sites is not unprecedented. Several other jurisdictions have identified a surveillance-location privilege. The District of Columbia Court of Appeals, in *Hicks v. United States*, 431 *A*.2d 18 (1981), first recognized the privilege. *Hicks* upheld the trial court's refusal to allow defense cross-examination about the precise surveillance post from which the police had observed drug transactions. The Court of Appeals for the District of Columbia Circuit subsequently approved of that privilege in suppression hearings in *United States v. Green*, 670 *F*.2d 1148 (1981). That court later extended the privilege to trials in *United States v. Harley*, 682 *F*.2d 1018, 1020 (D.C.Cir.1982), in which it said, "We now hold that the surveillance location privilege, like the

informer's privilege, applies at trial and that it, too, is to be applied through a balancing test controlled by 'the fundamental requirements of fairness.' " (quoting *Roviaro v. United States,* 353 *U.S.* 53, 60, 77 *S.Ct.* 623, 628, 1 *L.Ed.*2d 639, 645 (1957)).

The Supreme Judicial Court of Massachusetts recognized the privilege in *Commonwealth v. Lugo,* 406 *Mass.* 565, 548 *N.E.*2d 1263 (1990). Although reversing a lower court's refusal to allow cross-examination on the exact location of a surveillance site because it felt that the defendant had made a strong showing of need for the evidence, the court said:

> As the Appeals Court opinion noted, counsel have accepted the existence of a so-called "surveillance location privilege" and recognize that it has been analogized to the well-established informer's privilege. Policy reasons comparable to those which favor the nondisclosure of an informer support the privilege to keep a surveillance location secret. [*Id.* 548 *N.E.*2d at 1265 (citation omitted).]

Several Appellate Division opinions have grappled with the issue before us today. In *State v. Crudup,* 176 *N.J.Super.* 215, 220, 422 *A.*2d 790 (1980), the court said:

> We conclude that the trial judge should have conducted a hearing on the question of the necessity for withholding the location of [the officer's] vantage point similar to the kind of hearing held when the defendant demands the identity of an informer. The trial judge must accommodate the competing interests of the criminal defendant and the State. (Citation omitted).

Another panel confronting the question in *State v. Williams,* 239 *N.J.Super.* 620, 571 *A.*2d 1358 (1990), held that a privilege similar to the informer's privilege permitted the State to prosecute without revealing the surveillance location. Finally, the court in the companion case to this, *State v. Zenquis,* 251 *N.J.Super.* 358, 598 *A.*2d 245 (1991), and the lower court opinion in this case have also recognized the privilege.

This state's earlier decisions, like those of other jurisdictions, have noted that the surveillance-location privilege resembles the informer's privilege. Although important differences exist between the two, a similar policy motivates them: in certain instances, a defendant's right to gain access to information not vital to the defense must yield to society's interests in effective law enforcement and in encouraging citizens to cooperate with

the police. Those earlier appellate panels apparently thought that our *Evidence Rules* contained no privilege that applied to surveillance locations. Their decisions found a common-law surveillance-location privilege by analogy to the informer's privilege. We see no need to fashion a new common-law privilege, however, being content to anchor our decision to the proposition that information about the location is official information protected by *Evidence Rule* 34.

As indicated, we recognize the differences between the surveillance-location privilege and the informer's privilege. An informer's participation usually ends with the communication of the "tip" to the police. Most often, the informer has no further involvement in the activities that lead to a defendant's arrest. However, a police officer seeking to assert a surveillance-location privilege may often be the crucial, and perhaps the only, witness to the criminal transaction. When an informant takes part in the actions leading to arrest, that circumstance may strongly influence a court's refusal to conceal the informer's identity. *See State v. Milligan,* 71 *N.J.* 373, 386, 365 *A.*2d 914 (1976) (noting that other courts have found informant's participation "important, if not determinative[,] in warranting disclosure"). A trial is a truth-seeking event, and we are mindful that "the public * * * has a right to every man's evidence." 8 *Wigmore on Evidence* § 2192 at 70 (1961). Therefore, courts should impose limitations on relevant evidence " 'only to the very limited extent that * * * excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.' " *United States v. Trammel,* 445 *U.S.* 40, 50, 100 *S.Ct.* 906, 912, 63 *L.Ed.*2d 186, 195 (1980) (quoting *Elkins v. United States,* 364 *U.S.* 206, 234, 80 *S.Ct.* 1437, 1454, 4 *L.Ed.*2d 1669, 1695 (1960) (Frankfurter, J., dissenting)).

██ For that reason, the State must first convince a court that disclosure would compromise an important public interest. Although *Evidence Rule* 36 automatically recognizes an in-

former's privilege unless the party seeking disclosure makes a "substantial showing of need," *Cashen v. Spann*, 77 *N.J.* 138, 142, 389 *A.*2d 969 (1978) (quoting *State v. Oliver*, 50 *N.J.* 39, 47, 231 *A.*2d 805 (1967)), *Evidence Rule* 34 shields information only if its disclosure would be "harmful to the interests of the public." Therefore, the State must demonstrate a realistic possibility that revealing the location would compromise present or future prosecutions or would possibly endanger lives or property. The trial court should hold an *Evidence Rule* 8 hearing at which the State may attempt to justify application of the privilege. At that hearing the court should make a sealed record sufficiently detailed to facilitate appellate review. Defense counsel shall not attend the hearing.

Although certain dangers arise from the exclusion of defense counsel, such a rule is necessary to accomplish the goals of the privilege. We trust trial courts to apply properly the standards set forth above. Although we know that most defense attorneys will scrupulously honor an order of confidentiality, we must guard against the indiscretions of those few who may not. We cannot know who will violate the rule of confidentiality until forbidden disclosure occurs—too late for the victims of reprisal. The fact that a defense attorney who violates such an order would face sanctions would come as scant consolation to the victims. Reluctant as we are to exclude defense counsel, we are even more reluctant to risk the consequences of "loose talk."

Our decision to limit access to surveillance-location information is consistent with our decisions in *Loigman v. Kimmelman*, 102 *N.J.* 98, 505 *A.*2d 958 (1986), and *Milligan, supra*, 71 *N.J.* 373, 365 *A.*2d 914. In *Loigman*, we held that because of the tremendous sensitivity of government records that involve confidential informers, even the *court* might not have a right to inspect the requested documents *in camera*. In that case, we allowed the Attorney General to provide the court with a detailed description of the requested materials and directed the

court to examine that description before ordering production of documents for *in camera* inspection.

In *Milligan,* we noted that the State need not make the identity of an informer known to the court that was considering a defendant's request for disclosure of the information. Our reasoning in that decision applies in this instance as well. In rejecting a proposal that would have called for *in camera* proceedings with only the trial judge, the prosecuting attorney, and the informer present, we said:

> We believe that by requiring informers to appear in court before a judge, even though the defendant is excluded and the transcript is sealed, this proposal will effectively reduce cooperation with the police and defeat the purposes [that] underlie the informer's privilege. [71 *N.J.* at 393 n. 12, 365 *A.*2d 914.]

Likewise, *in camera* disclosure of surveillance locations in the presence of the defendant or defense counsel may reduce cooperation with the police. Many persons will choose not to offer their property for surveillance purposes if they know that a defendant's attorney will be present when the location is revealed. In cases not involving private citizens who have offered their property, the disclosure still may vitiate the privilege: the loss of one key surveillance site might cause the loss of innumerable arrests. The societal advantages resulting from that privilege favor prohibiting counsel from attending the initial *Rule* 8 hearing. To do otherwise jeopardizes persons and property.

The trial court, having considered the testimony that the police were still using the location for surveillances and that reprisals might occur, held that disclosure of the location might harm the public interest. Given the ample support for that conclusion, we find that the State met its preliminary burden.

### III

We emphasize, however, that application of the privilege must not deprive a defendant of the right to a fair trial. Like the informer's privilege, the surveillance-location privilege must yield when it infringes on a defendant's constitutional rights.

A defendant's right to cross-examine adverse witnesses is one of the most important protections afforded by the Sixth Amendment to the United States Constitution and Article 1, Paragraph 10 of our State Constitution. As the United States Supreme Court acknowledged in *Pointer v. Texas*, 380 *U.S.* 400, 403, 85 *S.Ct.* 1065, 1068, 13 *L.Ed.*2d 923, 926 (1965), the right to confront and cross-examine adverse witnesses is a "fundamental right essential to a fair trial."

██ Trial courts must consider possible disclosure of surveillance locations on a case-by-case basis. The balancing test outlined in *Roviaro, supra,* 353 *U.S.* 53, 77 *S.Ct.* 623, 1 *L.Ed.*2d 639, and adopted by this state in *Milligan, supra,* 71 *N.J.* at 383, 365 *A.*2d 914, to determine the applicability of the informer's privilege should apply in this context as well. If the State meets its preliminary burden for application of the privilege, the court should permit disclosure if the information sought is relevant and helpful to the defense or essential to a fair determination of the case. In *Grodjesk v. Faghani*, 104 *N.J.* 89, 99, 514 *A.*2d 1328 (1986), we echoed the view of the United States Supreme Court, which had noted:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of [the privileged information], and other relevant factors. [*Roviaro, supra,* 353 *U.S.* at 62, 77 *S.Ct.* at 628–29, 1 *L.Ed.*2d at 646.]

In deciding whether to require disclosure, a court must focus on the negative effect that such disclosure may have on the public good. As we said regarding the informer privilege, "It is for the benefit of the public that the Legislature has declared that information of this nature should be confidential in order to conduct the public's business of prosecuting crime." *Loigman, supra,* 102 *N.J.* at 108, 505 *A.*2d 958.

Absent some showing of need by a defendant for the exact surveillance location, the trial court should deny its disclosure.

In reaching that conclusion we note "the ease with which the privilege would be destroyed if disclosure were required without a substantial showing of need for it." *Oliver, supra,* 50 *N.J.* at 47, 231 *A.*2d 805. In *Milligan, supra,* we said:

> [W]hile we emphasize that courts *must* remain sensitive to the legitimate needs of defendants and to fundamental principles of fairness, they should not honor frivolous demands for information or unsubstantiated allegations of need. This is especially true where such demands would jeopardize the protection afforded police informers. Something more than speculation should be required of a defendant before the court overrules an informer's privilege of nondisclosure. [71 *N.J.* at 393, 365 *A.*2d 914.]

We are persuaded that a similar test should apply in respect of a surveillance location: a defendant must make a substantial showing of need to defeat the State's proper assertion of the privilege. As in the case of a request for an informer's identity, the appropriate standard of review is whether, after weighing the competing factors, the trial court abused its discretion. *Id.* at 384, 365 *A.*2d 914.

█ Therefore, if the trial court finds that the State has met its initial burden of showing that the information should be protected, a defendant may then request an *Evidence Rule* 8 hearing to attempt to show substantial need for the information. That procedure ensures a fair opportunity for the defense to make the case for disclosure and protects a defendant's right of confrontation.

In most cases, a defendant can conduct effective cross-examination at trial without learning the exact surveillance location. Allowing a defendant to inquire about certain important facts guarantees that a jury may critically examine testimony, while also serving the State's need for confidentiality.

█ Of course, some information is so vital that we can envision few circumstances in which a defendant would not be entitled to it. For instance, a defendant may always inquire about the distance from which the observation was made because that information closely relates to the ability of the witness to see what he or she claims to have seen. Second, a

defendant may always ask if the witness used some vision-enhancing article, *e.g.*, binoculars or a telescope, because disclosure of that information bears substantially on the witness's ability to perceive without sacrificing any public interest.

As a general rule, a defendant should be permitted to explore whether the officer observed the alleged crime from an elevated position. That fact often has great importance, given the better view that normally accompanies an elevated vantage point. Passing cars and pedestrians that block the view from street level may not hamper an officer who views a transaction from a raised position. Likewise, in many instances buildings in an area will be of comparable size, and revealing whether the view was elevated will not automatically divulge the surveillance point. In most situations, disclosing those facts will not sacrifice any public interests.

Finally, in most cases a defendant may inquire into the officer's angle of sight. Conditions such as the position of the sun at the time of the observation could bear on the witness's ability to see. The line of sight may also reveal whether the officer saw the activity across a crowded roadway or a vacant lot. In most, but not all, cases that information will not pinpoint the surveillance location. Therefore, unless the State establishes some good reason for nondisclosure, a defendant may examine a witness concerning line of sight.

In certain instances, particularly those in which the only evidence offered against a defendant is the testimony of the surveillance officer, a court may determine that disclosure is warranted. The record in the case before us, however, discloses sufficient opportunity to cross-examine the officers even without inquiring about the exact surveillance location.

Moreover, the State presented a substantial amount of corroborating evidence. The officers undertook their investigation because of an informer's tip that persons were dealing heroin in the area of Broadway and Clark. The recovery of the heroin from the abandoned freezer strongly corroborates the

officers' testimony. Furthermore, defendant has failed to show how the concealment of the surveillance location deprived him of effective cross-examination. In fact, defendant was able to demonstrate several inconsistencies in the officers' testimony. Also, defendant learned the distance and direction from which the officers had conducted the surveillance, that the officers had used binoculars, and that the officers had viewed the transaction from an elevated position. In light of that information, defendant has failed to show that disclosure of the exact location was essential or even helpful to a fair determination of his case. Therefore, the trial court's decision to issue the protective order was not a mistaken exercise of its discretion.

The trial court held an *Evidence Rule* 8 hearing with defense counsel present. Although that procedure deviates from the course we suggest, it afforded defendant a more-than-adequate opportunity to make the case for disclosure. If anything, the court provided defendant with more information than we require today. Therefore, we find that the court did not err in issuing the protective order.

## IV

Defendant also claims error on grounds of prosecutorial misconduct; the trial court's allowing a State's expert to testify despite the failure to have disclosed the witness's resume until the morning of his testimony; and limitation of cross-examination of the same expert. Our careful review of the record discloses no merit to any of those contentions.

## V

Judgment affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.