**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4849-17T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DELVIN JONES, a/k/a
DELVIN L. JONES JR.,

      Defendant-Appellant.

_____

      Submitted January 27, 2020 – Decided September 9, 2020

      Before Judges Moynihan and Mitterhoff.

      On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-11-0956.

      Joseph E. Krakora, Public Defender, attorney for appellant (David Anthony Gies, Designated Counsel, on the briefs).

      Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Stephen Christopher Sayer, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Delvin Jones appeals from his November 6, 2017 conviction for possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1), and possession with intent to distribute a CDS, N.J.S.A. 2C:35-5(b)(3). Defendant was arrested by law enforcement after officers allegedly observed him participate in several suspected drug transactions while they were surveilling an area known for high drug activity. On appeal, defendant principally argues: (1) that he was impermissibly barred from cross-examining an officer at trial as to the officer's distance from defendant when observing defendant's conduct; (2) that the trial judge's instruction on flight was improper; (3) that he was denied the effective assistance of trial counsel because his trial counsel failed to move to suppress certain physical evidence; and (4) that the trial judge failed to properly weigh the required factors when sentencing defendant. After reviewing the record, and in light of the governing legal principles, we reverse the trial judge's ruling barring cross-examination of the officer's surveillance area, vacate the judgment of conviction, and remand for a new trial.

A-4849-17T3

## I.

We discern the following facts from the trial record. On June 1, 2016, Trooper Falciani, an officer of the New Jersey State Police, conducted a sneak and peek operation in Millville on a street where there had been numerous arrests for the sale and purchase of narcotics. During the operation, Falciani "identified an individual who appear[ed] to be distributing narcotics," prompting him to continue surveilling the area.

Falciani saw defendant move back and forth between the porch and a second-floor apartment at 700 Buck Street several times. Using binoculars, Falciani then observed three hand-to-hand transactions from his location. During the third transaction, Falciani sent in an arrest team. While the arrest team advanced, both defendant and a third suspected customer exited the apartment, and defendant remained on the porch. Falciani then observed defendant reenter the apartment, "exit a window at the front of the residence," jump off the overhang, and run across the street in the direction of 711 Buck Street, at which point Falciani lost sight of him. Falciani informed the arrest team, which located defendant on the other side of the street and arrested him.

A State Police K-9 unit was dispatched, and a dog alerted police to a CDS located underneath a brick in the area where defendant had been arrested. Under

3

the brick was a drawstring bag filled with heroin and crack cocaine. Upon searching 700 Buck Street, Falciani discovered small rubber bands, scales, and a shopping bag filled with small Ziploc baggies.

On direct examination, Falciani testified that defendant was arrested while sitting on the steps of a house at 711 Buck Street. Falciani stated that after the arrest, officers field tested the drugs uncovered in the vicinity, and the test confirmed that the drugs were heroin and crack cocaine.

On cross-examination, defendant attempted to question Falciani as to his distance from 700 Buck Street while he observed defendant, but the State objected, claiming that the information was protected under the informational privilege exception. In response, defense counsel indicated that he would not question Falciani as to his specific location when making observations, but only concerning his distance from defendant when doing so. This prompted the judge to hold a Rule 104 hearing to decide whether to permit this line of questioning.

The judge advised the parties that he had conducted a "very brief . . . cursory in camera with [Falciani] concerning the surveillance location."[1] As a result of Falciani's representations in camera, the judge concluded that revealing

---

[1] The trial judge conducted two in camera proceedings. We have not been provided transcripts for either proceeding, and we are left to infer that these proceedings were conducted off the record.

A-4849-17T3

Falciani's "surveillance location would jeopardize current and ongoing investigations," and therefore disclosure was not permitted. The judge initially ruled that defendant could question Falciani as to his range of distance when making observations. However, after the prosecutor averred that disclosing Falciani's range of observation would reveal the surveillance location, the judge conducted a second in camera examination of Falciani. As the judge explained:

> The prosecutor indicated that [Falciani] indicated that such a disclosure of range would, in fact, reveal . . . the surveillance location, which I'd already indicated was not to be revealed under . . . State v. Garcia. That said, the . . . further in camera was able to have the [c]ourt provide what the [c]ourt believes would be a sufficient basis of examination . . . for the defense counsel that approximates a distance without . . . actually jeopardizing any . . . location[.] . . . The inquiry you can make is, were you from a distance from which with the assistance of the field glasses you were utilizing, you could make a positive identification of an individual at the 700 Buck Street location.

After the judge made this determination, defense counsel again stressed that he did not seek to elicit Falciani's specific location when making observations, but only his approximate distance when doing so. Counsel also objected to the form of questioning permitted by the judge, arguing it was detrimental to defendant. The judge responded:

> I reopened the in camera to explore areas that I had not explored with the trooper initially, and inquired as to

5

what his basis was for that. And upon hearing that, I agree[d] that such disclosure would, in fact, disclose the surveillance location, which would . . . jeopardize current and ongoing investigations . . . . I then inquired further as to what type of information could be disclosed without disclosing the surveillance location, predicated upon what's already been provided. Now . . . what has been provided so far is that observations were made of several areas on the structure located at 700 Buck Street, and that the . . . path of travel of the defendant was visible to the surveilling officer and that the surveilling officer utilized field glasses. That is a significant inquiry. The only thing I could find that would necessarily be something that may be inquired by the defense is whether . . . there were any obstructions to that field of view . . . so long as same do not reach into areas where it would pinpoint any particular location.

The judge concluded that based on his balancing of the State's interest in protecting the surveillance location versus defendant's need to elicit testimony to support his defense, he would permit defense counsel to ask whether Falciani "could make a positive identification of an individual in the locations he testified to from his location with the existence of field glasses and whether or not he had an obstructed or unobstructed view." The judge found those inquiries were sufficient "to afford the defense . . . the ability to cross-examine [Falciani] with regard to his ability to make observations."

When cross-examination resumed, defense counsel did not pursue the suggested line of questioning. Falciani conceded that officers were unable to

6

locate any of the three purchasers from the suspected drug transactions. Falciani also confirmed that no items recovered by law enforcement had been submitted for fingerprinting, and that he could not positively identify any items recovered from the apartment as belonging to defendant.

The State then called several other witnesses. Trooper David Daniels, a member of the arrest team, testified that at the time of the arrest, defendant looked to be tired and out of breath, and he was sweating. Daniels conceded on cross-examination, however, that these observations were not noted in Falciani's report.

The State then called Trooper Matthew Cocking, who was assigned to the canine unit at the time of defendant's arrest. On cross-examination, Cocking conceded that because defendant was arrested in an "active drug area," it was not surprising for his police dog to locate drugs there, and that he had no direct means of connecting the drugs found to defendant.

The State also called Mandelle Hunter, a forensic scientist in the State Police lab, who testified that lab testing confirmed that the drugs found in the vicinity of defendant's arrest were indeed heroin and cocaine. Hunter acknowledged on cross-examination, however, that she had no way to conclude that defendant had possessed the drugs.

 A-4849-17T3

The State also called Detective Jay W. Pennypacker, who was assigned to investigate the lease agreements for 700 and 711 Buck Street during defendant's investigation. Pennypacker had contacted the owners of both residences by letter and asked them to identify the properties' tenants. On cross-examination, Pennypacker testified that neither owner provided any documents evincing that defendant had lived at either residence.

On August 22, 2017, the judge held a charge conference, at which defendant requested that the judge tailor an instruction on flight "to fit the extent to which it might [apply] in [the] case." The judge proposed to read the model jury charge on flight, as there was testimony that defendant fled from 700 Buck Street, while stipulating that "[d]efendant denies any flight." Defendant initially disagreed because "[h]e was charged in connection with what was located at 711," but he ultimately consented to the charge.

Trial resumed on August 23, 2017, at which time defendant took the stand. On direct, defendant offered testimony that conflicted with Falciani's testimony. Defendant testified that before his arrest on June 1, 2016, he had visited his aunt in the area and then stopped at a store. Defendant claimed that he was arrested while walking after leaving the store, not while sitting on a step, as Falciani testified. Defendant denied being in the apartment where the suspected drug

transactions occurred but conceded that he had a relationship with Porchia Williams, the occupant of the apartment, and intended to visit her that day. He also claimed that he was not running when arrested by police, stressing that he had sprained his ankle several days prior, which he claimed belied Daniels' testimony that he had been sweating and looked out of breath. Finally, defendant denied possessing any drugs on the day of his arrest or owning any items seized from the apartment.

The State then called Williams as a final witness. Williams testified on direct examination that she had also been arrested on June 1, 2016, in connection with law enforcement's surveillance of her apartment at 700 Buck Street. Williams testified that defendant had not been living with her on the date of their arrests. The State introduced a bail intake form for the purposes of identification that the intake officer had filled out on June 2, 2016. On the form, which Williams acknowledged she had signed, defendant was listed as her cohabitant and boyfriend. Williams explained, however, that defendant had not been living with her, and that she had advised the intake officer that they were in a relationship and that "[defendant] was always over at [her] house." On cross-examination, Williams testified that she did not recall whether the intake officer

had told her that her signing the document would mean her attesting to their cohabitation.

After closing arguments, the judge charged the jury. As to flight, the judge gave the following charge:

> There has been some testimony in this case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defendant denies any flight. The question of whether the defendant fled after the commission of the crime is another question of fact for you to determine.
>
> Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant fearing that an accusation or an arrest would be made against him on the charge involved in the indictment, took refu[g]e in flight for the purpose of evading the accusation or arrest on the charge, then you may consider such flight in connection with all other evidence in the case as an indication or proof of consciousness of guilt.
>
> Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest . . . for the offense charged in the indictment.
>
> If after a consideration of all of the evidence you find the defendant fearing that an accusation or arrest would be made against him on the charge involved in this indictment, took refu[g]e in flight for the purpose of evading accusation or arrest then you may consider such flight in connection with all of the other evidence.
>
> . . . It is for you as the judges of the fact[s] to determine whether or not evidence of flight shows a consciousness of guilt and the weight to be given to such evidence in light of all of the other evidence in the case.

10

On August 24, 2017, the jury rendered a verdict finding defendant guilty of possession of a CDS and possession with intent to distribute a CDS.

At his October 27, 2017 sentencing, defendant averred that his arrest was the product of an illegal search of 700 Buck Street. Defendant also stated that he no longer wanted his present counsel to represent him. The judge denied defendant's request for substitute counsel and declined to address his allegations of an illegal search, as the case had already been tried. Defense counsel conceded that although the search of the apartment was arguably unconstitutional, he did not raise the issue at trial because he believed that the "facts that led to [defendant's] arrest were sufficiently attenuated," as the arrest was based principally on the CDS discovered in defendant's immediate vicinity, an area in which he had no reasonable expectation of privacy.

The judge concluded that based on the nature of the present offenses as being in the third-degree and because "[d]efendant has [a] history of offenses, has been exposed to a full array of criminal sanctions, including diversion, probation, and incarceration, none of which has dissuaded him from continued anti-social criminal behavior," he was a persistent offender under N.J.S.A. 2C:44-3(a). As defendant was a persistent offender with prior distribution charges, he was subject to a mandatory extended-term sentence. Based on a

A-4849-17T3

review of defendant's presentence report, the judge found that defendant had six prior indictable convictions since 2013, and based on defendant's status, he was subject to a sentencing range from three to ten years for the current conviction. The State conceded that defendant was going to school and was working and asked that the court consider these factors during sentencing. Defense counsel added that defendant pays his child support and is "trying to live a decent li[f]e," and he asked that the judge place defendant at the bottom of the extended range.

The judge gave substantial weight to several aggravating factors: the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); the extent of defendant's prior criminal record and the seriousness of the offenses for which he was previously convicted, N.J.S.A. 2C:44-1(a)(6); and the need for deterrence, N.J.S.A. 2C:44-1(a)(9). The judge emphasized defendant's history of convictions, including second-degree offenses and state prison sentences and that defendant is a repetitive offender in need of specific deterrence. The judge also determined that no mitigating factors applied.

The judge concluded that the aggravating factors substantially outweighed the mitigating factors. He added that a period of parole ineligibility was warranted based on "defendant's criminal nature and the nature . . . of the present

A-4849-17T3

offense." Ultimately, the judge sentenced him to seven years' imprisonment with a three-and-a-half-year period of parole ineligibility. This appeal ensued.

On appeal, defendant raises the following points:

POINT ONE

THE TRIAL COURT IMPROPERLY CONSTRICTED DEFENDANT'S CROSS-EXAMINAT[I]ON OF THE POLICE OFFICER AS TO THE SURVEILLANCE LOCATION, THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

POINT TWO

THE TRIAL COURT'S FAILURE TO PROPERLY MOLD THE FLIGHT INSTRUCTION TO THE FACTS OF THE CASE POSSESSED A CLEAR CAPACITY TO BRING ABOUT AN UNJUST JURY VERDICT.

POINT THREE

THE FAILURE OF DEFENDANT'S TRIAL ATTORNEY TO MOVE TO SUPPRESS THE EVIDENCE OF DRUG PARAPHERNALIA FOUND IN THE RESIDENCE AMOUNTED TO CONSTITUTIONAL INEFFECTIVENESS OF COUNSEL. (Partially raised below).

POINT FOUR

THE TRIAL COURT DID NOT CONSIDER THE REAL-TIME CONSEQUENCES RELATING TO DEFENDANT'S SENTENCE. (Not raised below).

We address each of these arguments in turn.

A-4849-17T3

II.

Defendant first argues that the trial judge erred by barring him from eliciting testimony as to Falciani's distance when he observed defendant. We review a trial court's evidentiary rulings for an abuse of discretion. Brenman v. Demello, 191 N.J. 18, 31 (2007). Thus, we will not disturb a trial court's evidentiary rulings unless they are "so wide off the mark that a manifest denial of justice resulted." Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999) (quoting State v. Carter, 91 N.J. 86, 106 (1982)). However, we review questions of law de novo. Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372 (1999).

Both N.J.S.A. 2A:84A-27 and N.J.R.E. 515 provide the following:

> No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public.

Under the official information privilege, "a surveillance location falls within the type of information that a court may conceal in the public interest." State v. Garcia, 131 N.J. 67, 73 (1993). "Trial courts must consider possible disclosure of surveillance locations on a case-by-case basis," id. at 80, and the decision to disclose or withhold a location "should be overturned only if the record discloses

14

a mistaken exercise of discretion in the application of the relevant factors," State v. Zenquis, 131 N.J. 84, 88 (1993).

To successfully invoke the privilege, "the State must demonstrate a realistic possibility that revealing the location would compromise present or future prosecutions or would possibly endanger lives or property." Garcia, 131 N.J. at 78. The defendant can overcome the privilege only by making "a substantial showing of need." Id. at 81. "[I]n determining whether the defendant has demonstrated 'substantial need,' the court should balance the defendant's need for that information with the public's interest in nondisclosure." Zenquis, 131 N.J. at 88. Relevant factors include the crime charged, possible defenses, the potential significance of the information, and the availability of evidence corroborating the officer's statements. See ibid.; Garcia, 131 N.J. at 80, 82-83.

Even where the State receives the benefit of the official information privilege, the defendant is entitled "to inquire about certain important facts" to help the jury "critically examine testimony, while also serving the State's need for confidentiality." Garcia, 131 N.J. at 81. "[S]ome [such] information is so vital that we can envision few circumstances in which a defendant would not be entitled to it," so the defendant may always question a witness about it. Ibid. Such information includes the distance from which the observation was made,

15

whether the witness used any vision-enhancing articles, whether the observation was made from an elevated position, and information about the witness's line of sight and angle of sight. Id. at 81-82. These facts may always be elicited absent "some strong State interest in their continued concealment." Zenquis, 131 N.J. at 89 (citing Garcia, 131 N.J. at 82).

Our Supreme Court considered the official information privilege in the companion cases of Garcia and Zenquis. In Garcia, police officers conducting surveillance, based on an informer's tip, observed Garcia and an accomplice engaging in what appeared to be drug transactions, so they apprehended Garcia. 131 N.J. at 71. The officers did not find any drugs or money on him but found heroin in a nearby freezer that he had been using. Ibid. Garcia was later convicted on several drug charges. Id. at 72. At trial, Garcia was able to question a testifying officer as to his elevation, distance, and direction when making observations, and his use of binoculars. Id. at 71. However, the trial court issued a protective order barring Garcia from discovering the precise surveillance location. Id. at 72.

On appeal, Garcia asserted that the court's suppression of the precise location of the surveillance site "unconstitutionally limited his right of cross-examination." Ibid. The Court disagreed, finding that the record "disclose[d]

A-4849-17T3

sufficient opportunity to cross-examine the officers even without inquiring about the exact surveillance location." Id. at 82. The Court concluded that because the

> defendant learned the distance and direction from which the officers had conducted the surveillance, that the officers had used binoculars, and that the officers had viewed the transaction from an elevated position[,] . . . [he] has failed to show that disclosure of the exact location was essential or even helpful to a fair determination of his case.
>
> [Id. at 83.]

What differentiates this case from Garcia is the fact that defense counsel did not seek to question Falciani about the precise location from which the surveillance was conducted. Unlike Garcia, where the court permitted extensive cross-examination concerning the officer's vantage point, here the judge allowed no cross-examination on factors concerning distance, line of sight, or elevation. See id. at 71. The judge's ruling was based on two brief in camera conversations with Falciani, from which he concluded that disclosure of the distance from which the officer observed defendant would necessarily reveal the officer's precise location and endanger current and future investigations. Unfortunately, we are hampered in our review of that determination because the in camera

17

hearings were apparently off the record and there is otherwise no support in the record for the judge's conclusion.

Moreover, as the Court made clear in Zenquis, even where ongoing surveillance may be compromised, the confidential information privilege may nevertheless require divulgence of a precise surveillance location. In Zenquis, after an in camera hearing, the trial court barred the defendant from questioning the officer as to his specific location, line of sight, and elevation when making observations, and limited further cross-examination to whether the officer was indoors at the time he observed defendant. 131 N.J. at 87. On appeal, the Court concluded that barring testimony of the specific location was improper, as the defendant's need for the testimony was substantial because "the case against him turned almost exclusively on [the officer's] testimony." Id. at 88-89. In so ruling, the Court distinguished the matter from Garcia:

> Unlike the facts in Garcia, the police did not receive a tip that persons were selling heroin in the area nor did they locate a supply of drugs in the vacant lot where the alleged drug transaction had occurred. The police found no drugs on defendant[,] . . . [and] [w]ithout access to the surveillance site, defendant's sole defense necessarily was simply a denial of the charges. The case depended on the jury's appraisal of the credibility of [the officer] and defendant; but the protective order impeded the jury's opportunity fairly to assess the officer's credibility.

[Id. at 89.]

The Zenquis Court concluded that even though the defendant was able to elicit testimony as to "some of the important facts concerning the site," that defendant's substantial need for the information warranted disclosure of the specific location. Ibid. In rendering this decision, the Court focused principally on the fact that "the trial court failed to give due consideration to defendant's interests and thereby violated his right of confrontation in refusing to divulge the exact location," without engaging in any discussion as to the balancing of defendant's interest with that of the State. Ibid.

With these guiding principles in mind, we conclude that the trial judge's decision to prevent defendant from questioning Falciani concerning his ability to make observations was a mistaken exercise of discretion. We find that the trial judge placed undue emphasis on the State's interest in maintaining confidentiality and did not consider defendant's demonstrated need to cross-examine Falciani as to his ability to identify defendant. See Garcia, 131 N.J. at 81. In that regard, here as in Zenquis, defendant's guilt turns principally on Falciani's credibility. There was no corroborative testimony from an informant or other witnesses who observed defendant's conduct, nor physical evidence linking defendant to a CDS. The State's witnesses all testified that there was no

19                                                                      A-4849-17T3

objective way to link defendant to any of the CDS recovered from either his vicinity or from 700 Buck Street.[2]

On remand, the trial judge should determine if defendant's substantial need to elicit Falciani's distance was overcome by a strong State interest in the continued concealment of this information. See Zenquis, 131 N.J. at 89 (citing Garcia, 131 N.J. at 82). In this regard, while the trial judge concurred with the prosecutor that testifying as to the distance of Falciani's surveillance location would necessarily disclose the specific location, this position is unsupported by the record. We are without the transcripts of the in camera reviews conducted by the judge and are unaware as to the specifics of that discussion aside from the judge's conclusory comments that he agreed with the prosecutor's position.

Based on the record, we find that, as in Zenquis, the trial judge did not give due consideration to the extent to which the defense strategy required impeaching Falciani, which should have been accommodated by allowing defendant to ask questions regarding Falciani's distance, use of binoculars, elevation, and line and angle of sight when making observations. See Garcia, 131 N.J. at 81-82. We conclude that the sought-after questioning concerning,

---

[2] While both defendant's and William's testimony established that they knew each other, it did not directly link defendant to the alleged drug transactions.

among other factors, the distance from which Falciani made his observations was potentially both helpful and perhaps essential to the defense. See Garcia, 131 N.J. at 83. "[T]he question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." State v. Slaughter, 219 N.J. 104, 119 (2014) (alterations in original) (quoting State v. Dennis, 185 N.J. 300, 302 (2005)). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Pillar, 359 N.J. Super. 249, 277-78 (App. Div. 2003) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279-80 (1993)).

That defendant was precluded from eliciting testimony regarding Falciani's ability to make observations, "[n]o matter that the likelihood of [his] contentions might be slim," it constituted a violation of his sixth amendment right to confront the witnesses against him. State v. Crudup, 176 N.J. Super. 215, 221 (App. Div. 1980); see generally Zenquis, 251 N.J. Super. at 367-69. Accordingly, we cannot say with any degree of confidence that the error was harmless beyond a reasonable doubt. See Slaughter, 219 N.J. at 118-19 ("[W]here the trial court commits a constitutional error, that error is to be considered 'a fatal error, mandating a new trial, unless we are able to declare a

belief that it was harmless beyond a reasonable doubt.'" (quoting State v. Cabbell, 207 N.J. 311, 338 (2011)) (internal quotation marks omitted)).

Because this matter must be retried, the remaining issues on appeal are moot and therefore will not be addressed.

Reversed in part, vacated in part and remanded for a new trial.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4849-17T3